2009 UT App 369

**STATE of Utah, Plaintiff and Appellee,**

v.

**Robert VAN DYKE, Defendant and Appellant.**

**No. 20080613–CA.**

Court of Appeals of Utah.

Dec. 10, 2009.

Shelden R. Carter, Provo, for Appellant.

Mark L. Shurtleff, atty. gen., and Ryan D. Tenney, asst. atty. gen., Salt Lake City, for Appellee.

Before Judges ORME, DAVIS, and McHUGH.

## OPINION

McHUGH, Judge:

¶ 1 Robert Van Dyke appeals his conviction for driving under the influence of alcohol (DUI), *see* Utah Code Ann. § 41–6a–502 (2005).[1] Van Dyke asserts that the trial court erred in denying his motion to suppress evidence, his motion to dismiss, and his motion to arrest judgment postconviction. Van Dyke also appeals the trial court's decision to permit the State to comment on his assertion of his Fifth Amendment rights. We affirm.

## BACKGROUND [2]

¶ 2 On September 25, 2007, Van Dyke was arrested for DUI as he was leaving a sports park in Spanish Fork, Utah. As he walked toward his car in the parking lot, Van Dyke passed a couple (Husband and Wife) who was walking along the same pathway with their four children. Van Dyke ap-

---

1. As a convenience to the reader, all references to the Utah Code are to the most recent codification.

2. "In setting out the facts from the record on appeal, we resolve all conflicts and doubts in favor of the jury's verdict and the rulings of the trial court." *State v. Babbell*, 770 P.2d 987, 988 (Utah 1989).

proached them and began a conversation with the couple's six-year-old. Husband and Wife found the conversation odd because neither they nor their son knew Van Dyke and he was talking loudly and laughing. Wife also smelled alcohol on Van Dyke as he walked past her. After watching Van Dyke stare into space for a while before driving out of the lot, Husband called 911.

## I. The 911 Call

¶ 3 Husband informed the 911 dispatch operator that he was reporting a drunk driver. When asked why he believed that Van Dyke was drunk, Husband responded,

> Oh, he walked right past me and my son and he was trying to talk to my son. You could smell it on his breath and my wife smelled him too. The guy was just clearly intoxicated. He was just, the way he was acting. He tried to strike up a conversation with my little boy.

¶ 4 Husband described Van Dyke as having black hair and a goatee. He also provided a description of the car, including its color, make, model, and license plate number, as well as its direction of travel. Before concluding the call, Husband identified himself and gave the dispatch operator his phone number. Dispatch then relayed the information to officers via a computer communication. The dispatch communication stated, "[G]reen jeep cherokee/poss[ible] dui/just leaving the new part of ball pa[rk/plate number] ... dealer plate/male with goatee/t[ime]l[apse] one minute/went towards main st unk[nown] from there[/]walked past [reporting party] and could smell the alcohol on his breath and definitely intoxicated."

## II. The Traffic Stop

¶ 5 Officer Matt Johnson was traveling southbound on Main Street in Spanish Fork when he saw Van Dyke's vehicle turn north onto Main Street from the sports park. Officer Johnson followed Van Dyke for nine and one-half blocks, during which time he saw Van Dyke's vehicle weave "one or two times" within the lane and three times onto the center divider line. However, Officer Johnson observed no traffic violations.

¶ 6 At approximately 50 North Main Street, Van Dyke voluntarily pulled off the road and stopped the vehicle. Officer Johnson "pulled in behind the vehicle and activated [his] emergency lights." Because Van Dyke had exited his vehicle, Officer Johnson ordered him back into the car.

## III. Van Dyke's Refusal to Be Tested

¶ 7 Officer Johnson approached Van Dyke's vehicle. In response to Officer Johnson's inquiry, Van Dyke confirmed that he was traveling from the sports park. Officer Johnson then requested Van Dyke's driver license and vehicle registration. Van Dyke "fumbled through his wallet for a few seconds to locate his driver[ ] license and then ... look[ed] in the billfold portion ... for the registration." [3] Eventually, Van Dyke produced a sales receipt for a different vehicle, which Van Dyke explained belonged to another car owned by his father's dealership. During their conversation, Officer Johnson noticed "a strong odor of an alcoholic beverage coming from [Van Dyke's] person," Van Dyke's slurred speech, and his slow responses to questioning. Officer Johnson asked Van Dyke to exit the vehicle to perform field sobriety tests. Van Dyke refused, and when asked why, he responded, "Fifth." Officer Johnson then placed Van Dyke under arrest for DUI.

¶ 8 Officer Johnson transported Van Dyke to the Utah County Jail where he was booked for DUI. The officer then advised Van Dyke of the penalties under Utah Code section 41–6a–520 for refusing a police request for chemical testing to determine an accused's level of intoxication. He asked Van Dyke to submit to blood, breath, and urine tests (collectively, chemical tests), and Van Dyke refused, again asserting his rights under the Fifth Amendment.

---

**3.** Officer Johnson testified that he found this behavior odd because most people keep their registration in the glove box. Van Dyke's father, who testified for the defense, explained that the vehicle belonged to his dealership and that it is common for salesmen to carry the documentation for such vehicles in their wallets.

## IV. The Trial

¶ 9 Van Dyke was charged by information for DUI. Van Dyke moved to suppress the evidence obtained from the stop, claiming that it was the product of an unreasonable seizure. The trial court denied this motion, and the case proceeded to trial by jury. The trial court also denied Van Dyke's motion in limine, which sought to exclude evidence of or references to Van Dyke's invocation of his Fifth Amendment rights.

¶ 10 At trial, the State presented the testimonies of a scorekeeper at the ballpark (Scorekeeper), Husband, Wife, the three officers responding to the dispatch report, and the booking officer. Their testimonies produced the following evidence against Van Dyke.

¶ 11 Scorekeeper testified that Van Dyke approached her to discuss the postponement of his baseball game. She stated that Van Dyke was initially nice to her but that "all of a sudden he started getting belligerent, swearing at [her], just yelling." He also smelled "really bad," "like alcohol." Van Dyke's encounter with Scorekeeper lasted approximately twenty minutes.

¶ 12 Van Dyke then left Scorekeeper's office and headed to his car. Along the way, he met Husband, Wife, and their son. Husband and Wife both testified that they did not know Van Dyke and that he engaged their six-year-old son in a conversation that was "out of the ordinary" because Van Dyke was loud and laughing. Husband also said that he immediately noticed Van Dyke's slurred speech and glazed eyes. Wife testified that she smelled alcohol on Van Dyke and that he was limping. Both Husband and Wife observed that when Van Dyke reached his vehicle, he stared across the parking lot for several seconds, as if he were "in a stupor," before loading his baseball gear into his car and driving out of the lot toward Main Street. It was then that Husband decided to call 911.

¶ 13 Officer Johnson testified that upon locating the vehicle described in the dispatch report, he followed it until it stopped on the side of the road. Detective Phil Nielsen and Officer Trent Shepherd arrived at the scene shortly thereafter to provide back-up assistance. Detective Nielsen testified that he stood by the front passenger window of Van Dyke's vehicle while Officer Johnson returned to his car to check for any outstanding warrants. Detective Nielsen further testified that he could smell alcohol inside the vehicle and that Van Dyke's movements appeared "slow and lethargic." At one point, Van Dyke turned the keys in the ignition to start the car and Detective Nielsen reached inside, turned off the vehicle, and removed the keys from the ignition.

¶ 14 Officer Johnson stated that he returned to the vehicle and requested that Van Dyke complete field sobriety testing. When Van Dyke refused, Officer Johnson arrested Van Dyke for DUI. As he was exiting the vehicle, Van Dyke placed his hand on the hood, but Officer Johnson reported no other problems with Van Dyke's balance. By that time, Van Dyke's father had arrived and was standing next to Officer Shepherd at the rear of Van Dyke's vehicle. According to Officer Shepherd, Van Dyke paused to say, "I'm sorry, [D]ad," before Officer Johnson placed Van Dyke in the rear of his police cruiser. A search incident to the arrest produced one unopened can of beer, cold to the touch, behind the front passenger seat.

¶ 15 Deputy Daniel Herrin was working in the jail booking area when Van Dyke arrived. Deputy Herrin testified that Van Dyke's "speech was very slurred, his eyes had a glassy appearance[,] ... [and he] just appeared incoherent, a little confused." He also recalled that Van Dyke was unsteady and staggered as he entered the booking area, but Deputy Herrin did not remember if Officer Johnson had to assist him.

¶ 16 Following the State's case-in-chief, the defense moved for dismissal on the ground that the State failed to carry its burden. The trial court denied this motion, concluding that the State "ha[d] established the prima facie case that would allow the final deliberations of the jury." The jury convicted Van Dyke. Pursuant to rule 23 of the Utah Rules of Criminal Procedure, Van Dyke filed a motion to arrest judgment, asserting that the State presented insufficient evidence to support the DUI conviction. That motion was also denied. Van Dyke now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 17 Van Dyke first asserts that the trial court erred in denying his motion to suppress because Officer Johnson did not have reasonable suspicion to justify the investigatory detention as required by the Fourth Amendment.[4] "In an appeal from a trial court's denial of a motion to suppress evidence, 'we review the trial court's factual findings for clear error[,] and we review its conclusions of law for correctness.'" *Salt Lake City v. Bench,* 2008 UT App 30, ¶ 5, 177 P.3d 655 (quoting *State v. Tiedemann,* 2007 UT 49, ¶ 11, 162 P.3d 1106), *cert. denied,* 199 P.3d 367 (Utah 2008). "In search and seizure cases, no deference is granted to . . . the [trial] court regarding the application of law to underlying factual findings." *State v. Alverez,* 2006 UT 61, ¶ 8, 147 P.3d 425.

¶ 18 Van Dyke also claims that the State's introduction of his refusal to perform field sobriety tests or submit to chemical tests violated his Fifth Amendment privilege against self-incrimination.[5] We review constitutional questions for correctness. *See State v. Norcutt,* 2006 UT App 269, ¶ 7, 139 P.3d 1066.

¶ 19 Van Dyke's final challenge is to the sufficiency of the evidence to support his DUI conviction. Van Dyke claims that the evidence was insufficient and that the trial court improperly denied his motion to arrest judgment.

> On a motion to arrest judgment, the court may only reverse a jury verdict when the evidence[, viewed in favor of the jury's verdict,] is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he . . . was convicted.

*State v. Robbins,* 2009 UT 23, ¶ 14, 210 P.3d 288 (internal quotation marks omitted).[6]

## ANALYSIS

### I. Motion to Suppress

¶ 20 Van Dyke asserts that the evidence supporting his conviction was obtained through an illegal seizure in violation of the Fourth Amendment to the United States Constitution. "The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (internal quotation marks omitted).[7] As a level two encounter,[8] an investigatory detention is

---

4. Van Dyke also argues that this action was in violation of his rights under the Utah Constitution. But, because Van Dyke neither made separate arguments under the state constitution nor offered any explanation of how the court's analysis under the state constitution would differ from its consideration under the federal constitution, we consider Van Dyke's challenge to the seizure under the federal constitution only. *See generally State v. Martinez,* 2008 UT App 90, ¶ 3 n. 5, 182 P.3d 385 (reasserting that appellate courts do not engage in independent analysis under the state constitution where a party does not support that claim with analysis and legal authority).

5. In his appellate brief and at oral argument before this court, Van Dyke claimed that his state constitutional privilege against self-incrimination was also violated. However, Van Dyke failed to develop a state constitutional argument separate from his federal claim, relying instead on the fact that "such analysis has already been undertaken and pronounced." *See generally State v. Worwood,* 2007 UT 47, ¶ 18, 164 P.3d 397 (requiring more developed analysis than "cursory references to the state constitution").

6. In his statement of the issues, Van Dyke claims also to challenge the trial court's denial of his motion to dismiss following the State's case-in-chief. Van Dyke failed to brief this issue, and we therefore do not address it further. *See Valcarce v. Fitzgerald,* 961 P.2d 305, 313 (Utah 1998) ("[A]n appellate court will decline to consider an argument that a party has failed to adequately brief.").

7. The Fourth Amendment, "by virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers." *New Jersey v. T.L.O.,* 469 U.S. 325, 334, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (internal quotation marks omitted); *see also C.R. v. State (In re A.R.),* 937 P.2d 1037, 1040 (Utah Ct.App.1997), *aff'd,* 1999 UT 43, 982 P.2d 73.

8. A level two encounter is one in which a person no longer believes he is free to leave. *See Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (requiring reasonable suspicion when encounter is no longer consensual). Officer Johnson's activation of his emergency lights and directive that Van Dyke return to his car escalated the encounter with Van Dyke to a

constitutional "when the officer has reasonable, articulable suspicion that a person has been, is, or is about to be engaged in criminal activity." *State v. Markland*, 2005 UT 26, ¶ 10, 112 P.3d 507 (internal quotation marks omitted); *see also Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (requiring an officer "to point to specific and articulable facts, taken together with rational inferences from those facts, [which] reasonably warrant th[e] intrusion"). We determine whether an officer had reasonable suspicion based on the totality of the circumstances. *See State v. Kohl*, 2000 UT 35, ¶ 11, 999 P.2d 7.

### A. Officer Johnson Lacked Independent Reasonable Suspicion.

■ ¶ 21 The facts supporting reasonable suspicion "are usually grounded in an officer's personal perceptions and inferences." *Kaysville City v. Mulcahy*, 943 P.2d 231, 234 (Utah Ct.App.1997). Here, Officer Johnson reported that he followed Van Dyke for nine and one-half blocks, during which he saw no traffic infractions or other strong indicators of DUI. The sole behavior of concern witnessed by Officer Johnson was Van Dyke's weaving within the lane four or five times. However, "if failure to follow a perfect vector down the highway ... were sufficient reason[] to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy." *United States v. Lyons*, 7 F.3d 973, 976 (10th Cir.1993) (holding that three to four weaves within the lane and the defendant's failure to make eye contact did not justify a detention); *accord State v. Bello*, 871 P.2d 584, 587 (Utah Ct.App.1994) (holding that a single incident of inter-lane weaving did not support reasonable, articula-

level two investigatory detention. *See generally Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (noting that a seizure, subject to Fourth Amendment protections, occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen"); *State v. Adams*, 2007 UT App 117, ¶ 14, 158 P.3d 1134 (identifying "flashing ... police lights" as a show of force sufficient to create a level two detention), *cert. denied*, 168 P.3d 1264 (Utah 2007).

ble suspicion under the totality of the circumstances).

### B. Officer Johnson Gained Sufficient Reasonable Suspicion from the 911 Dispatch.

■ ¶ 22 Although Officer Johnson did not have reasonable suspicion to justify a stop based on his personal observations, he also had information available to him from the police dispatch. "[T]he evidence uncovered in the course of the stop is admissible if the police [officer] who *issued* the [communication] ... possessed a reasonable suspicion justifying a stop." *United States v. Hensley*, 469 U.S. 221, 233, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *see also Mulcahy*, 943 P.2d at 234 ("[Where] the investigation end[s] in arrest and the stop's legality [is] attacked, the State must—albeit after the fact—establish that adequate articulable suspicion initially spurred the dispatch." (internal quotation marks omitted)). We assess whether the officer who issued the dispatch has reasonable suspicion based upon both the content of the information provided and its degree of reliability. *See Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

■ ¶ 23 In determining whether an informant's tip is sufficient to create reasonable suspicion, we consider three factors. The first factor evaluates "the type of tip or informant involved." *Mulcahy*, 943 P.2d at 235. Tips from unbiased, identified citizens, such as Husband, are given a high degree of reliability. *See Salt Lake City v. Bench*, 2008 UT App 30, ¶ 15, 177 P.3d 655, *cert. denied*, 199 P.3d 367 (Utah 2008);[9] *Mulcahy*, 943 P.2d at 235. "This is because citizen informers, unlike police informers, volunteer information out of concern for the community and not for personal benefit," *State v. Brown*, 798 P.2d 284, 286 (Utah Ct.App.1990), and

9. In *Salt Lake City v. Bench*, 2008 UT App 30, 177 P.3d 655, *cert. denied*, 199 P.3d 367 (Utah 2008), this court concluded that the fact the 911 call came from the defendant's ex-wife created a circumstance "where a citizen-informant's veracity may properly be called into question," *id.* ¶ 15, thereby making the "detail of the information provided and corroboration" more important, *id.* ¶ 16.

are subject to criminal prosecution and civil liability for false reports. *See Mulcahy*, 943 P.2d at 235. Here, Husband identified himself and provided a telephone number where he could be reached.

¶ 24 The second factor is "whether the informant gave enough detail about the observed criminal activity to support a stop." *Id.* at 236. With regard to the second factor, Husband not only notified the dispatch operator of the existence of a suspected drunk driver but also provided her with a description of Van Dyke and his vehicle's make, model, and color, the license plate number, and the location of the vehicle. In support of his conclusion that Van Dyke was intoxicated, Husband stated that (1) Van Dyke smelled of alcohol; (2) Van Dyke tried to have a conversation with Husband's young son;[10] and (3) in Husband's opinion, based on the way Van Dyke was acting, Van Dyke was clearly intoxicated. Although, without elaboration, these behaviors may have had an innocent explanation, an officer "is not obligated to rule out innocent conduct prior to initiating an investigatory detention." *State v. Martinez*, 2008 UT App 90, ¶ 4, 182 P.3d 385 (internal quotation marks omitted). Indeed, while it may not be significant by itself, "[t]his court has previously found that smelling alcohol on the breath of a defendant is an articulable fact supporting a finding of reasonable suspicion." *State v. Bean*, 869 P.2d 984, 988 (Utah Ct.App.1994); *see also State v. Abell*, 2003 UT 20, ¶ 37, 70 P.3d 98 (noting that the determination that a driver stopped at a checkpoint should be singled out for sobriety testing can be made very quickly "where the smell of alcohol is obvious").

And we have recognized that "members of the general public have a common knowledge about whether a person is under the influence of alcohol." *Bench*, 2008 UT App 30, ¶ 20, 177 P.3d 655 (internal quotation marks omitted).[11] Further, these details are considered more reliable when, as was the case here, the informant personally observes the incident and makes the report as the events are unfolding. *See id.* ¶ 18 (noting the significance of a report made as the events are happening); *Mulcahy*, 943 P.2d at 236 (determining the informant's tip had a high degree of reliability because the informant was reporting details that he personally observed as he was seeing them).

¶ 25 Finally, we must determine "whether the police officer's personal observations confirm the dispatcher's report of the informant's tip." *Mulcahy*, 943 P.2d at 236. Here, Officer Johnson did not personally observe any traffic violations or other indicators of DUI. Nevertheless, there was sufficient information provided to the dispatcher from an unbiased citizen informant to support the reasonable suspicion that Van Dyke was operating a motor vehicle while intoxicated. Husband reported that Van Dyke smelled of alcohol and was "clearly intoxicated." *See Martinez*, 2008 UT App 90, ¶ 8, 182 P.3d 385 (observing that the officer was not required to corroborate the informant's tip where tip contained sufficient detail and the informant was "a reliable source"). The police dispatcher could rely on those articulated facts as support for the reasonable suspicion necessary to stop Van Dyke to investigate further. *See Mulcahy*, 943 P.2d at 235 (recognizing high reliability of information

10. Van Dyke argues that there is nothing inculpatory about an adult engaging in friendly conversation with a six-year-old in the company of his parents. While we agree that such an encounter may not create suspicion in most instances, Husband's reliance on Van Dyke's conversation with Husband's young son as a reason for his conclusion that Van Dyke was intoxicated suggests that Van Dyke's demeanor or the circumstances of the encounter were atypical.

11. We acknowledge that this assumption may be less persuasive in situations where the informant has had little or no exposure to alcohol. Consequently, it is prudent for 911 operators, like the operator in this case, to request additional infor-

mation about the basis of the informant's conclusion. *See generally Bench*, 2008 UT App 30, ¶ 19 n. 4, 177 P.3d 655 (noting that "compelling details" bolstering informant's report of the defendant's intoxication, including a strong smell of alcohol, poor balance, slurred speech, and glassy eyes, "were neither volunteered [by the informant] nor elicited by the dispatcher"). We reject Van Dyke's argument that the further information provided by Husband actually reduced the reasonableness of the dispatcher's suspicion. The odor of alcohol and Van Dyke's unusual behavior were properly considered as part of the totality of the circumstances supporting reasonable suspicion of criminal behavior.

received from a citizen informant). Officer Johnson was therefore justified in relying on the dispatch, *see Hensley*, 469 U.S. at 233, 105 S.Ct. 675, and the motion to suppress was properly denied.

## II. Fifth Amendment Privilege Against Self-incrimination

■ ¶ 26 Van Dyke next argues that the trial court erred in admitting evidence that he refused to submit to sobriety testing, instead invoking his Fifth Amendment privilege. The privilege against self-incrimination (the privilege) embodied in the Fifth Amendment to the United States Constitution protects "an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Schmerber v. California*, 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).[12] This privilege has been "limited to prohibiting the use of 'physical or moral *compulsion*'" to cause a person to provide evidence against himself. *South Dakota v. Neville*, 459 U.S. 553, 562, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983) (emphasis added) (quoting *Fisher v. United States*, 425 U.S. 391, 397, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976)).

¶ 27 The issue before us today has previously been addressed by the United States Supreme Court in *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). South Dakota had enacted an implied consent law, under which all persons operating a motor vehicle consented to a chemical blood test when arrested for DUI. *See id.* at 559, 103 S.Ct. 916. The South Dakota law allowed a suspect to refuse a blood-alcohol test, subject to loss of driving privileges. *See id.* at 559–60, 103 S.Ct. 916. The law also required police officers to inform suspects of this choice. *See id.* at 560, 103 S.Ct. 916. Because the state wished to discourage refusals, it allowed evidence of the refusal to be admitted at the criminal trial. *See id.*

¶ 28 After failing field sobriety tests, the defendant in *Neville* refused to submit to a blood-alcohol test. *See id.* at 555, 103 S.Ct.

916. The defendant later moved to suppress the evidence of his refusal, arguing that admission of the refusal violated his Fifth Amendment privilege. *See id.* at 556, 103 S.Ct. 916. Although the South Dakota Supreme Court agreed with the defendant, *see id.*, the United States Supreme Court reversed, concluding that the privilege was not violated because "the [s]tate did not directly compel [the defendant] to refuse the test, for it gave him the choice of submitting to the test or refusing," *id.* at 562, 103 S.Ct. 916. The Court noted that requiring a selection between two unappealing courses of action was not the same as compelling either alternative. *See id.* at 564, 103 S.Ct. 916. Unlike a situation in which each of the defendant's options could not be compelled, *see id.* at 563–64, 103 S.Ct. 916, the choice presented by the implied consent law and the refusal penalty statute involved at least one course of action-submitting to the blood test-that the state could compel. *See Schmerber*, 384 U.S. at 765, 86 S.Ct. 1826 (holding that submission to a blood-alcohol test could legitimately be coerced because blood tests produce physical evidence, which is not protected by the privilege, rather than testimonial evidence, which is protected). Thus, the offer to submit to chemical testing became "no *less* legitimate when the [s]tate offer[ed] a second option of refusing the test, with the attendant penalties for making that choice." *Neville*, 459 U.S. at 563, 103 S.Ct. 916; *see also Pennsylvania v. Muniz*, 496 U.S. 582, 605 n. 19, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (extending the holding of *Neville* to breathalyzer tests).

¶ 29 Utah has adopted an implied consent law, which is similar to the South Dakota statute considered by the Supreme Court in *Neville*. It provides, in pertinent part,

(1)(a) A person operating a motor vehicle in [Utah] is considered to have ... consent[ed] to a chemical test or tests of the person's breath, blood, urine, or oral fluids for the purpose of determining whether the person was operating or in actual physical control of a motor vehicle while:

(i) having a blood or breath alcohol content statutorily prohibited ... [or]

---

**12.** The Fifth Amendment applies to the States pursuant to the Fourteenth Amendment. *See*

*Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

(ii) under the influence of alcohol. . . .

Utah Code Ann. § 41–6a–520(1)(a)(i)–(ii) (Supp.2009). Despite the implied consent law, the legislature permits a suspect to refuse chemical testing, subject to admission of that refusal at any proceedings arising out of the arrest, *see id.* § 41–6a–524 (2005), as well as certain other administrative consequences, *see id.* § 41–6a–520(2).[13] When notifying suspects of the right to refuse, the officer must also warn the driver of the administrative consequences of his refusal. *See id.* A Utah police officer is not, however, required to warn a suspect that the refusal can be used against him. *See id.* §§ 41–6a–520(2), – 524.

■ ¶ 30 Like the defendant in *Neville,* Van Dyke was presented with a choice between two unappealing options: (1) submitting to chemical testing at the risk of registering an alcohol concentration above the legal limit or (2) refusing the test and suffering the attendant consequences. However, "any compulsion exercised [by the State] on [Van Dyke] is to compel him to *take* the test." *See Sandy City v. Larson,* 733 P.2d 137, 139 (Utah 1987) (citing *Neville,* 459 U.S. at 564, 103 S.Ct. 916).[14] Such compulsion does not violate the privilege because it elicits nontestimonial evidence. *See Neville,* 459 U.S. at 563, 103 S.Ct. 916 (noting that the state could compel a blood test); *Schmerber,* 384 U.S. at 765, 86 S.Ct. 1826 (permitting admission of blood test results because they are not testimonial and do not implicate the privilege). Because Van Dyke could be le-

gally compelled to submit to chemical testing, *see Schmerber,* 384 U.S. at 765, 86 S.Ct. 1826; *see also Muniz,* 496 U.S. at 605 n. 19, 110 S.Ct. 2638 (same for breath analyses), it was not improper for the State to offer him an alternative, *see Neville,* 459 U.S. at 563, 103 S.Ct. 916. Refusal to submit to chemical testing therefore is not a coerced act and is not protected by the privilege. *See id.* at 564, 103 S.Ct. 916.

¶ 31 Van Dyke contends that his refusal to submit to field sobriety tests should not have been admitted at trial. Whether the analysis of *Neville* should be extended to field sobriety tests is an issue of first impression in Utah.[15] And the Utah statute is silent on whether evidence of an accused's refusal to perform field sobriety tests is admissible in a criminal proceeding, *see* Utah Code Ann. § 41–6a–524. However, Van Dyke makes no suggestion that the field sobriety tests Officer Johnson requested would have led to testimonial evidence. *See generally Schmerber v. California,* 384 U.S. 757, 765, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (holding that blood test results are admissible because they are nontestimonial evidence unprotected by the Fifth Amendment). Consequently, we do not analyze the field sobriety tests separately here.[16]

■ ¶ 32 Van Dyke also argues that the officer was required to notify him that the privilege did not apply to implied consent laws and that his refusal could be used against him in court. The United States

---

**13.** Such consequences include revocation of the driver license, a five- or ten-year prohibition on driving with any measurable alcohol in the person's body, and the imposition of an ignition interlock device for three years. *See* Utah Code Ann. § 41–6a–520(2) (Supp.2009).

**14.** Considering this issue under the Utah Constitution, the Utah Supreme Court in *Sandy City v. Larson,* 733 P.2d 137 (Utah 1987), adopted the analysis of *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), to hold that the privilege under the Utah Constitution had not been violated when the defendant had to choose between complying with the implied consent statute or refusing chemical testing. *See Larson,* 733 P.2d at 139–40. Our supreme court had previously determined that the privilege guaranteed by the Utah Constitution extended the same protections as the federal Fifth Amend-

ment privilege. *See American Fork City v. Crosgrove,* 701 P.2d 1069, 1072, 1075 (Utah 1985).

**15.** Although the State argued in its brief that *State v. East,* 743 P.2d 1211 (Utah 1987), had answered this question, the State conceded at oral argument that the *East* court did not reach the issue because the defendant complied with the officer's request to complete field sobriety tests, *see id.* at 1211.

**16.** We reject Van Dyke's argument that the Oregon Supreme Court decision of *State v. Fish,* 321 Or. 48, 893 P.2d 1023 (1995), suggests a different result. Although the Oregon Supreme Court upheld the suppression of evidence of the defendant's refusal to perform field sobriety tests, it did so solely on the basis of the Oregon Constitution. *See id.* at 1024, 1027 n. 3. Accordingly, *Fish* is not persuasive.

Supreme Court has rejected this argument, holding that introduction of evidence that an accused refused chemical testing is not a violation of the due process clause, even when the accused was not warned that the refusal was admissible in proceedings against him. *See South Dakota v. Neville,* 459 U.S. 553, 565-66, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983) (holding that warning of only some of the consequences of refusal "comported with the fundamental fairness required by due process"). Van Dyke has advanced no argument to support a different conclusion under our state constitution.

III. Motion to Arrest Judgment/Sufficiency of the Evidence

¶ 33 Finally, Van Dyke contends that his conviction should be reversed because no evidence was presented to demonstrate that he was incapable of safely operating his vehicle. The State counters that Van Dyke has failed to comply with the marshaling requirements. When an appellant challenges the sufficiency of a jury's verdict, he "must marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict." *State v. Waldron,* 2002 UT App 175, ¶ 13, 51 P.3d 21 (internal quotation marks omitted). Van Dyke contends that he has met this requirement.

¶ 34 The disagreement between the State and Van Dyke over the adequacy of marshaling seems to be caused primarily by their different views of the proof necessary to convict Van Dyke. In Utah, a person may be convicted of DUI if he is driving or has actual physical control of a vehicle with a blood alcohol concentration of 0.08 grams or greater, *or* if he is under the influence of alcohol, drugs, or any combination "to a degree that renders the person incapable of safely operating a vehicle." *See* Utah Code Ann. § 41-6a-502(1) (2005). Because Van Dyke refused to submit to testing that could establish his actual blood alcohol concentration, he was charged and convicted under the latter provision.

¶ 35 Van Dyke contends that to prove he was under the influence of alcohol to the extent that he was incapable of safely operating a vehicle, the State had to show that he actually operated his vehicle unsafely. Consequently, Van Dyke marshals only the evidence that Officer Johnson observed no traffic violations despite following him for nine and one-half blocks and that no other witness testified that he was driving recklessly. Under Van Dyke's interpretation of the statute, how he drove the vehicle is the only relevant inquiry.

¶ 36 In contrast, the State relies on all of the evidence presented at trial concerning Van Dyke's behavior before he entered his vehicle. The State then asserts that the jury was free to infer from that evidence that Van Dyke was too drunk to drive safely. We agree with the State's interpretation of the statute. *Cf. State v. Lehi,* 2003 UT App 212, ¶ 16, 73 P.3d 985 (stating that in accepting a guilty plea, the trial court was obligated to "ask [the d]efendant if he would admit the facts required by [the incapable of safely operating a vehicle] prong, i.e., that he operated or was in actual physical control of a vehicle while intoxicated to such a degree that he was incapable of safely operating a vehicle"). Even in the absence of direct evidence that the defendant drove recklessly or violated traffic rules, the jury was free to consider all of the evidence presented to determine whether his level of impairment was such that it was unsafe for him to drive. *Cf. id.* (indicating that admission of the degree of intoxication was sufficient to uphold a conviction under this prong, even without an admission of actual unsafe operation of a vehicle).

¶ 37 As has been set forth in detail in our recitation of the facts, there was ample evidence from which the jury could find that Van Dyke had consumed enough alcohol to impair his ability to operate a vehicle safely. Scorekeeper, Wife, two of the responding officers, and the booking officer all testified that Van Dyke smelled of alcohol. And Husband, Wife, and the officers also indicated that his speech was slurred and that his eyes were glassy. In addition, Scorekeeper, Husband, and Wife each testified about conduct they observed where Van Dyke exhibited a lack of control of his actions and impaired

judgment. Under these circumstances, there was sufficient evidence from which the jury could find, beyond a reasonable doubt that Van Dyke's level of intoxication made it unsafe for him to be driving.

## CONCLUSION

¶ 38 We affirm the denial of Van Dyke's motion to suppress the evidence obtained from Officer Johnson's detention of Van Dyke because under the totality of the circumstances, there was reasonable, articulable suspicion to justify a stop to investigate whether Van Dyke was driving a vehicle under the influence of alcohol. Further, because Van Dyke was not compelled to refuse sobriety testing, his Fifth Amendment privilege against self-incrimination was not violated by the introduction of that refusal in the criminal proceedings. Finally, we affirm the conviction and the trial court's denial of Van Dyke's motion to arrest judgment because the evidence was sufficient to support the jury's verdict.

¶ 39 WE CONCUR: GREGORY K. ORME and JAMES Z. DAVIS, Judges.