**2025 UT App 139**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BREANNA DUTTON,
Appellant.

Opinion
No. 20220515-CA
Filed September 25, 2025

Sixth District Court, Kanab Department
The Honorable Mandy Larsen
No. 201600056

Ramon Ortiz, Debra M. Nelson, and Benjamin Miller,
Attorneys for Appellant

Derek E. Brown and Jeffrey D. Mann, Attorneys for
Appellee, assisted by law student Sara Blamires.[1]

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

CHRISTIANSEN FORSTER, Judge:

¶1  A jury convicted Breanna Dutton of driving under the influence of alcohol or drugs (DUI). *See* Utah Code § 41-6a-502. Dutton now appeals, arguing that because the arresting officer lacked probable cause to arrest her, the district court erred in denying her motion to suppress the evidence resulting from the arrest. Dutton additionally argues that her trial counsel rendered ineffective assistance in failing to request a specific unanimity jury instruction when "the State relied on multiple 'scenarios' for

---

1. *See* Utah R. Jud. Admin. 14-807 (governing law student practice in the courts of Utah).

conviction." We are not persuaded by either argument, and we affirm Dutton's conviction.

BACKGROUND

¶2     On July 15, 2020, Dutton left her home in Kanab, Utah, to drive to a nearby bank. Reportedly concerned that her boyfriend was withdrawing money from her accounts without her authorization, she intended to go into the bank to discuss the issue. However, due to COVID-19 pandemic restrictions, the lobby of the bank was closed, and Dutton was required to use the drive-up window. The employees at the bank were concerned about Dutton's driving, noting that it was "pretty iffy" whether Dutton "would even make it in there correctly," referring to the drive-up window. The employees next noticed that Dutton's speech was "slow" and that she "seemed kind of out of it." Further, she did not "really seem like she knew what she wanted." The employees conferred with each other about the situation and, out of concern for Dutton and the safety of the public, called 911 to report her driving and behavior. In the call, one employee explained, "[W]e are a little worried . . . that she should even be driving, she looks pretty intoxicated."

¶3     A sergeant with the Kanab City Police Department (Sergeant) was notified by dispatch about the situation and was asked to respond. Dispatch relayed that it had been reported by bank employees that an individual named Breanna Dutton "just wasn't acting right at the [drive-up window] and they thought she might be under the influence." Dispatch gave Sergeant a description of the vehicle Dutton was driving. Sergeant had a history with Dutton, having known her a "very long time"—since the time she was about sixteen years old (she was thirty-four years old when arrested). Sergeant's wife had been Dutton's drill team coach in high school. And when he had needed to visit her family's home for one reason or another, he would interact with her. Most recently, he had run into her at the local elementary

school and had a friendly conversation with her. Based on all these interactions, Sergeant was confident in his ability to recognize Dutton's typical behavior when she was not under the influence of alcohol or drugs.

¶4    When Sergeant arrived at the bank, Dutton's vehicle was no longer there. Sergeant then spotted the vehicle "up the street," so he drove after it. After catching up to the vehicle and seeing "a taillight or a break light out on the vehicle," he attempted to pull Dutton over. Because she was almost to her house, Dutton parked her car in her driveway. When Sergeant approached Dutton, and before he had even asked for her driver license and registration, Dutton handed him "a whole bunch of paperwork." Sergeant had no need for most of the papers—which included a debit card and a receipt from the bank—and handed back everything except her registration. He had to ask separately for her driver license. As he talked with Dutton, Sergeant immediately noticed that she was acting abnormally. He observed that "her speech was very slurred" and "thick tongued." He asked her to step out of the vehicle, and she "stumbled" while complying with his request.

¶5    Sergeant then began to question Dutton. Her speech continued to be "slurred, a little bit hard to understand, [and] prolonged," and her "words [were] drawn out more" than would be the case in a typical conversation. He tried to have a casual conversation with her to figure out what was going on. Although Sergeant "couldn't smell any alcohol" on Dutton, her responses "didn't flow" and were "kind of scattered," almost like she was "disoriented." It took Sergeant "a minute to kind of comprehend what exactly . . . it was that she said to make it fit in the context of the question that was asked." He later explained, "This told me that there was something wrong. This was not the Breanna I knew." Sergeant also had previous training as a drug recognition expert and in other DUI recognition methods, having investigated "[c]lose to a thousand" DUI cases over the course of his career. In Sergeant's experience, the behavior Dutton was exhibiting

usually indicated alcohol or drug use. Accordingly, he asked her to perform field sobriety tests.

¶6      Sergeant started with the horizontal gaze nystagmus (HGN) test. In an HGN test, an officer uses a stimulus, "usually a pen or pen light," and the individual being tested is told to follow the stimulus movement with his or her eyes. The officer then follows the movement of the pupils, looking for a nystagmus or a "bouncing of the eye." During the HGN test, the officer is looking for a series of clues in three separate areas for each eye for a total of six clues: lack of smooth pursuit, nystagmus at maximum deviation, and onset of nystagmus before forty-five degrees.

¶7      Dutton presented four clues during the HGN test (two for lack of smooth pursuit and two for nystagmus at maximum deviation). And "according to the standardized training" Sergeant had received, four clues is "usually a pretty good indicator that someone is over or at about the .08 limit for alcohol."[2] And although not all drug use "show[s] nystagmus," Sergeant later explained, "[I]f I see nystagmus in someone's eye and I don't smell any alcohol, my first thought is . . . that it's going to be some sort of depressant that someone is on." Thus, the four clues reinforced Sergeant's suspicion that Dutton was under the influence of some drug.

¶8      Typically, in such a situation, Sergeant would then proceed with two other field sobriety tests, but after learning that Dutton had an injured back and that she was about to have surgery on it, he decided against more tests, both for her safety and because the tests would likely have been ineffective. At this point, Sergeant spoke with a deputy from the Kane County Sheriff's Office who

---

2. Although Sergeant's testimony regarding his training refers to Utah's previous blood alcohol concentration limit of .08 grams, *see* Utah Code § 41-6a-502(1) (2018), the current limit of .05 grams was in effect at the time of Dutton's arrest, *see id.* § 41-6a-502(1) (2019).

had just arrived on scene, and they deliberated on how to proceed. Sergeant "was very hesitant about actually arresting [Dutton]," but due to her speech issues and failed nystagmus test, he "felt it was necessary" to arrest her. As he later reported, "I did not believe she was safe to drive."

¶9 Sergeant then arrested Dutton for driving under the influence. Her blood was also drawn, and subsequent testing revealed methamphetamine, amphetamine, diazepam, nordiazepam, and temazepam. The methamphetamine was in a toxic range. The amphetamine, diazepam, and nordiazepam were in clinical or therapeutic ranges, while the temazepam was in the subtherapeutic range. These levels were "consistent with someone who could be impaired."

¶10 Dutton was charged with driving under the influence, enhanced to a third-degree felony because she had two or more prior DUI convictions. Dutton's attorney (Counsel) filed a motion to suppress the evidence resulting from the arrest, arguing that Dutton "was arrested without probable cause" in violation of the United States Constitution. Counsel contended that the probable cause standard "is an objective, not subjective standard" and, therefore, that Sergeant's prior experience with Dutton was inappropriately considered in the probable cause calculation. After an evidentiary hearing, the district court denied Dutton's motion. The court explained that while Sergeant's prior relationship with Dutton "carrie[d] some significant weight with [the court]" in finding probable cause, there were independent, objective factors that led Sergeant to conclude that Dutton was under the influence. These included (1) that "he was told that there was possibly an intoxicated driver having a hard time in the drive-up" window at the bank, (2) that "he immediately noticed what he said was thick tongue and slurred speech," (3) that Dutton handed him multiple unnecessary documents—including a debit card and a receipt—when he approached the vehicle, (4) that Dutton "stumbled" when she exited the vehicle, and

(5) that there were multiple clues presented during the HGN test. The court commented that there was a practical problem with requiring a small-town cop who "has a personal relationship with his people . . . to set all of the knowledge aside when he knows somebody is not acting normally, when he knows what they're like when they . . . act normal." The court concluded, therefore, that Sergeant's personal knowledge of Dutton "coupled with" the objective facts listed above were sufficient to establish probable cause.

¶11    At trial, the State called three witnesses, who testified as to the facts set forth above: the employee at the bank who called 911, Sergeant, and the forensic toxicologist who tested Dutton's blood. The defense's only witness was Dutton. In her defense, Dutton explained that she handed multiple documents to Sergeant because she had them out from her visit to the bank and because she was borrowing her father's car and did not know exactly where the registration was. She noted that she originally was not nervous because she felt she had not done anything wrong and because she knew Sergeant. However, she said she began to become more nervous when she saw Sergeant talk with three other officers who had arrived on scene, causing her to panic because she realized "this wasn't just [a stop because] a taillight [was] out." Dutton testified, "I was just trying to stay calm and not get erratic . . . because I had no idea what this was about. . . . I was all over the place . . . ."

¶12    Dutton explained that while Sergeant was talking with the other officers, she ingested drugs: "I had a straw in my purse with a methamphetamine and Valium. I smashed that and snorted it, threw it[,] and knew I was going to jail." She had purchased the drugs weeks before her arrest, just before she left Utah to attempt detoxing on her own. She testified that it was the first time that day she had used drugs and that she had been clean for a couple of weeks. While she acknowledged that she was in control of the vehicle when she snorted the drugs in the driveway, she argued,

"[T]here was no way I would have been impaired at that time." She stated that it "was an hour" between her ingestion of the drugs and the eventual blood draw.

¶13   During the State's rebuttal, Sergeant was questioned about the inconsistency between Dutton's testimony and his own previous testimony. He noted that he only remembered one other officer at the scene but said, "[I]t wouldn't surprise me if a couple others showed up and then left." Sergeant explained that the period of time when he stepped away from Dutton—the time in which Dutton claimed to have snorted the drugs—was "less than five minutes" and that he maintained "a visual of her the entire time." When asked whether he could "completely see what she was doing," he explained he could "see her sitting in the vehicle" but not "what her hands were doing." He also testified that when he returned to the car, he saw no evidence of recent drug use. He estimated that the time between the stop and the blood draw was "30 to 45 minutes."

¶14   Jury instructions were read to the jury. These instructions included the State and the defense's "stipulation of fact" that "the defendant was in actual physical control of a vehicle while she was parked in her driveway, until she exited the vehicle at the request of [Sergeant]." The jury was also instructed on the elements of DUI, as follows:

> You cannot convict her of this offense unless, based on the evidence, you find beyond a reasonable doubt each of the following elements: [1], Breanna Dutton; [2], A, operated a vehicle or, B, was in actual physical control of a vehicle; and, [3], was under the influence of any drug to a degree that rendered her incapable of safely operating a vehicle.

The jury was further instructed that "a unanimous concurrence of all jurors is required before a verdict can be reached."

¶15    In his closing argument, the prosecutor highlighted the State's theory of the case against Dutton: "I think it's pretty obvious under—under the State's story of what happened that she ingested those drugs before she went to the bank, that she was under the influence of those drugs, and she wasn't safe to drive." But the prosecutor also addressed the alternative story told by Dutton: "Now, you've heard a different story from the defendant, right? Her story is, Nope, didn't take the drugs until after I stopped the vehicle. Even under her scenario, she's still guilty. She—we've agreed that she was in actual physical control at that time—at the time that she says that she took those drugs. And she also agrees that that amount of drugs would make her not safe to drive."

¶16    The jury ultimately found Dutton guilty of DUI. Since this was her third DUI conviction in ten years, the court entered the conviction as a third-degree felony. The court suspended her prison sentence and placed her on probation. Dutton now appeals.

ISSUES AND STANDARDS OF REVIEW

¶17    Dutton first argues that because Sergeant lacked probable cause to arrest her, the district court erred in denying her motion to suppress. "A [district] court's decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation is a mixed question of law and fact. Factual findings are reviewed for clear error, but legal conclusions are reviewed for correctness." *State v. Evans*, 2021 UT 63, ¶ 20, 500 P.3d 811 (quotation simplified).

¶18    Dutton also argues that Counsel provided constitutionally ineffective assistance by not requesting a specific unanimity jury instruction. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was

deprived of the effective assistance of counsel as a matter of law." *State v. Alires*, 2019 UT App 206, ¶ 15, 455 P.3d 636 (quotation simplified).

## ANALYSIS

### I. Denial of the Motion to Suppress

¶19 Dutton contends that the district court erred in denying her motion to suppress the evidence from her arrest. She argues that the court based its denial on the personal relationship between Sergeant and herself, in effect endorsing a subjective probable cause standard that "is irrelevant under the Fourth Amendment" and its objective standard. She argues that the "objective facts—without [Sergeant's] background knowledge—weren't enough to establish probable cause." Although we agree with Dutton that Sergeant's "prior experiences with [her] heavily influenced the district court's ruling," we ultimately agree with the State that the court did not err because even without considering the factors that Dutton objects to, there remained "sufficient probable cause to arrest Dutton based on the totality of the circumstances."[3]

---

3. This is not to say, however, that we agree with Dutton that Sergeant's (or the district court's) reliance on subjective knowledge here was entirely improper. *See* 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.2(d) (6th ed. 2024) (discussing *Brinegar v. United States*, 338 U.S. 160 (1949), wherein the United States Supreme Court determined that "the defendant's criminal record" was "probative evidence [that] was properly taken into account in deciding that the officer acted with probable cause," and noting that "[o]n essentially this reasoning, other courts have held that a suspect's prior convictions and prior arrests or charges are not barred from consideration on the issue of probable cause" (footnotes omitted)). We also recognize the

(continued…)

¶20 When an officer does not have a warrant, the officer can still arrest an individual "if there is probable cause to believe that [that individual] has committed or is committing an offense." *State v. Trane*, 2002 UT 97, ¶ 26, 57 P.3d 1052 (quotation simplified). "Probable cause is an objective standard" that "strikes a balance between the rights of individual citizens and the interests of the people as a whole in law enforcement." *State v. Spurgeon*, 904 P.2d 220, 226 (Utah Ct. App. 1995). The United States Supreme Court has explained, "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. . . . However, . . . the substance of all the definitions of probable cause is a reasonable ground for

_____

difficulty that the district court referenced of expecting "the town cop, who has been a cop for 30 years, [and] has a personal relationship with his people . . . to set all of the knowledge aside when he knows somebody is not acting normally, when he knows what they're like when they . . . act normal." But in this case we need not engage in definitive line-drawing on this matter because the totality of the circumstances clearly supported the court's determination of probable cause. Thus, any inappropriate reliance on subjective factors would at most amount to only harmless error. *See State v. Hernandez*, 2024 UT App 71, ¶ 25, 549 P.3d 643 ("Even if there is error on the part of the [district] court, an error is harmless and does not require reversal if it is sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings. . . . When addressing claims involving the violation of a federally protected constitutional right, federal law sets a higher standard and instructs that we cannot declare federal constitutional error harmless unless we sincerely believe that it was harmless beyond a reasonable doubt." (quotation simplified)), *cert. denied*, 558 P.3d 86 (Utah 2024).

belief of guilt . . . ." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quotation simplified).

¶21 "In addressing the requirement of probable cause to arrest without a warrant," the Utah Supreme Court has explained that the objective probable cause standard considers "whether from the facts known to the officer, and the inferences which fairly might be drawn therefrom, a reasonable and prudent person in [the officer's] position would be justified in believing that the suspect had committed the offense." *State v. Anderson*, 910 P.2d 1229, 1232–33 (Utah 1996) (quotation simplified). Both the "quantity and quality" of those facts "are considered in the totality of the circumstances." *State v. Hinmon*, 2016 UT App 215, ¶ 12, 385 P.3d 751 (quotation simplified). And when the officer is aware of an "informant's tip," that tip is also appropriately included in the totality of the circumstances considered. *Id.* ¶ 18 (quotation simplified).

¶22 Here, considering the totality of the circumstances, Sergeant had probable cause to arrest Dutton even without any reliance on his background knowledge of her. First, Sergeant had received notice of a tip from an informant that Dutton seemed to be driving under the influence. Then, after pulling Dutton over, Sergeant observed Dutton acting in a manner that indicated she was under the influence of some substance. Finally, Dutton presented four clues during the HGN test. These three facts taken together would lead a reasonable person to justifiably believe that Dutton was driving under the influence.

¶23 As to the informant's tip, Dutton argues that because Sergeant did not "hear the 911 call from the bankers" and did not "interview those witnesses," he could not have used the tip from them in determining whether he had probable cause. While it is true that Sergeant did not personally hear the 911 call or talk with the employees at the bank, he nonetheless was told by dispatch that someone from the bank reported Dutton "just wasn't acting

right at the [drive-up window] and they thought she might be under the influence." And "[i]t is well-established in this state that the articulable facts supporting reasonable suspicion may come from an officer's own observations as well as *external information* such as an informant's tip via police dispatch, or information, bulletins or flyers received from other law enforcement sources." *State v. Kohl*, 2000 UT 35, ¶ 13, 999 P.2d 7. Moreover, as the State points out, the tip had several characteristics indicating reliability, including that the tip was not anonymous, that it was based on first-hand knowledge, and that it involved assessing something— intoxication—that is within the general public's common knowledge. *See State v. Purser*, 828 P.2d 515, 517 (Utah Ct. App. 1992) ("[R]eliability and veracity are generally assumed when the informant is a citizen who receives nothing from the police in exchange for the information."); *State v. Van Dyke*, 2009 UT App 369, ¶ 24, 223 P.3d 465 ("We have recognized that members of the general public have a common knowledge about whether a person is under the influence of alcohol. Further, these details are considered more reliable when, as was the case here, the informant personally observes the incident and makes the report as the events are unfolding." (quotation simplified)).

¶24    Furthermore, the observations reported in the tip were confirmed by various of Sergeant's personal observations. Sergeant, after pulling Dutton over, immediately noticed odd behavior indicating she was possibly under the influence of something. When he first approached the car, Dutton handed Sergeant a stack of documents that were unrelated to her driver license and registration. Sergeant also noticed during the encounter that Dutton's speech was "thick tongued," "slurred," and "slow." Sergeant then saw Dutton stumble as she exited her vehicle and observed that she continued to speak in a slow, halting, and strange manner. And when they conversed, Sergeant noticed that Dutton's answers to questions "didn't flow like [they] should have in a normal conversation," that she exhibited

"scattered thought," and that "she acted disoriented." Finally, Dutton presented four of the six clues during the HGN test.[4]

¶25    Thus, even when we set aside Sergeant's subjective knowledge about Dutton and what was "normal" for her, the totality of the remaining circumstances with which Sergeant was presented justified a reasonable belief that Dutton had been driving a vehicle while intoxicated and, thus, provided probable cause to arrest Dutton. Just because Sergeant knew that these problematic signs displayed by Dutton (such as her slurring, confusion, and stumbling) were not normal for her, the signs still remain objective factors indicative of intoxication that supported the finding of probable cause. Thus, the district court did not err in denying Dutton's motion to suppress.

## II. Ineffective Assistance of Counsel

¶26    Dutton additionally argues that because there were two theories about when she became intoxicated—that she took the drugs sometime before she left her house to go to the bank or that

---

4. Dutton contests this characterization of her performance on the HGN test, pointing to the district court's oral finding that Sergeant "found two clues that he testified to." But it appears quite clear from the immediately preceding language that the court's finding, when taken in context, was not that two *clues* were found, but that two of the *areas tested* resulted in clues (which would mean four total clues—one for each eye in each area where a clue was presented): "There was lack of smooth pursuit, slow response. It's not definitive but it's part of the totality of the evidence. There was maximum deviation in both eyes. He did not find onset." Thus, the record demonstrates that the court credited Sergeant's testimony regarding finding four clues in conducting the HGN test (two related to lack of smooth pursuit, two related to nystagmus at maximum deviation, and none related to onset of nystagmus before forty-five degrees).

she, instead, ingested the drugs shortly after she was pulled over while Sergeant had stepped away from her car—Counsel performed deficiently in failing to request a specific unanimity jury instruction and, therefore, reversal of her conviction is warranted. We disagree.

¶27 Obtaining a reversal of a conviction due to the ineffective assistance of trial counsel entails two showings. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient," that is, "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense," that is, "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* Here, Dutton fails to make the second showing. *See id.* at 697 ("The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

¶28 "The constitutional requirement that a jury must be unanimous as to distinct counts or separate instances of a particular crime is well-established in our law." *State v. Alires*, 2019 UT App 206, ¶ 19, 455 P.3d 636 (quotation simplified); *see also* Utah Const. art. I, § 10 ("In criminal cases the verdict shall be unanimous."). But we see no likelihood that the jury was not unanimous in its verdict here.

¶29 Dutton argues that the jury was presented with two distinct theories upon which to convict: "Either (1) [Dutton] drove her vehicle while under the influence to and from the bank or (2) [Dutton] was under the influence while parked in her driveway, waiting for [Sergeant's] return, while in actual physical control of the vehicle." But the primary problem for Dutton is that

based upon the testimony given at trial, the second theory strains credibility. That is, we think it incredibly unlikely that any juror would believe that Dutton was not under the influence until after she was pulled over—that she had *not* been intoxicated when she had so much trouble navigating the bank drive-up window that it prompted a call to 911, that she was *not* intoxicated when she (unprompted) shoved all the unnecessary documents at Sergeant, and that she was *not* intoxicated when she was slurring her words and speaking with a "thick tongue" at the outset of the stop. Though the results of the blood test taken about an hour after Dutton was arrested showed high levels of drugs in Dutton's system and could explain either theory, it is not likely that the jury believed Dutton's version.

¶30    Thus, even had the jury been specifically instructed as to unanimity, we see no real probability—let alone a reasonable probability—that the result here would have been different. *See Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). Thus, Dutton's ineffective assistance of counsel claim fails for a failure to show prejudice.


CONCLUSION

¶31    The district court did not err in concluding that there was probable cause to support Dutton's arrest and in denying her motion to suppress. And Dutton has not demonstrated ineffective assistance of counsel because the alleged deficient performance was not prejudicial under the circumstances of this case. We therefore affirm.

—————