2011 UT App 291

STATE of Utah, Plaintiff and Appellee,

v.

Billy Justin CHARLES, Defendant and Appellant.

No. 20090845–CA.

Court of Appeals of Utah.

Aug. 25, 2011.

---

Troy L. Booher and Katherine Carreau, Salt Lake City, for Appellant.

Mark L. Shurtleff and Ryan D. Tenney, Salt Lake City, for Appellee.

Before Judges DAVIS, ORME, and ROTH.

## OPINION

ORME, Judge:

¶ 1 Defendant Billy Charles appeals his 2009 conviction of murder, a first-degree felony, *see* Utah Code Ann. § 76–5–203 (Supp. 2010),[1] on the grounds that his constitutional right to due process was violated, his trial counsel was ineffective, and the trial court erred by failing to provide a jury instruction on jailhouse informant testimony. We reverse and remand for a new trial.

## BACKGROUND [2]

¶ 2 In August 1996, Defendant was living with his girlfriend and their two-year-old son.

---

1. For the convenience of the reader and because the provisions in effect at the pertinent times do not differ—in any way relevant to this appeal—from the statutory provision currently in effect, we cite to the current version of the Utah Code.

2. When "setting out the facts from the record on appeal, we resolve all conflicts and doubts in favor of the jury's verdict and the rulings of the trial court." *State v. Van Dyke*, 2009 UT App 369, ¶ 1 n. 2, 223 P.3d 465 (citation and internal quotation marks omitted), *cert. denied*, 230 P.3d 127 (Utah 2010).

Several hours after Defendant went to work on August 7, 1996, his sister discovered his girlfriend's body submerged in the bathtub. She could not be revived. The police first believed that she had accidentally drowned, but the medical examiner later ruled the death a homicide.

¶ 3 Eleven years later, in November 2007, the State charged Defendant with murder. In April 2009, a jury convicted Defendant. Defendant moved to arrest judgment, claiming, in part, that the State had misrepresented the nature of its agreement with a jailhouse informant who had testified at trial. After an evidentiary hearing, the trial court denied the motion and subsequently sentenced Defendant to prison for a term of five years to life.

¶ 4 During the eleven years between the murder and the filing of charges, the police undertook various investigatory measures, including: (1) placing a recording device on the victim's grave; (2) sending—in 2002 and 2007—physical evidence acquired in 1997 for DNA testing; (3) interviewing nearby residents about reports of suspicious activity in the area around the time of the victim's death; (4) testing hairs found in the victim's hand (finding that one of them was hers and the other two did not belong to Defendant); (5) investigating an anonymous confession letter received in August 1996; (6) sending, in 2007, clippings from the victim's fingernails for testing; and (7) using various other methods to seek information, such as offering a reward. Defendant suggests, rather persuasively, that the police did not know any more about Defendant's possible culpability in 2007 than they did in 1996.

¶ 5 At trial, Defendant testified that for some time before his girlfriend's death, he had been having mechanical trouble with the gear shift linkage of his 1972 Ford truck. He testified that he could not shift the truck in or out of gear from inside the car when he was parked on a sloping surface, such as his driveway. As a result, he needed someone inside the vehicle to step on the brake while he manually shifted the transmission gears

underneath the vehicle from neutral to reverse. After the truck was backed out of the driveway, he would again shift the gears underneath the vehicle from reverse to drive. However, he was able to shift the truck into gear when he was on a flat surface because he could get under the truck without worrying about being run over. He also told the police that when he stopped at his sister's house on the morning of the murder, he was able to shift the truck into gear by himself by using a mason's brush to block the tire.

¶ 6 Because of these mechanical problems, Defendant had been borrowing his sister's car to get to work, but her car was not available on August 7. On August 6, Defendant, his girlfriend, and their son walked to her grandmother's house to ask about borrowing her car the next day. However, the grandmother could not loan Defendant her car.[3]

¶ 7 On the night of August 6, Defendant had parked in the driveway. He testified that his girlfriend helped him get his truck going the next morning around 6:00 a.m. by braking from inside the truck while he changed gears underneath the vehicle. At the same time, his next-door neighbor was getting ready to take a family trip, and he made several trips between his house and his station wagon to load and install car seats. He recalled that Defendant's truck was running but did not recall seeing anyone by the truck. He also saw the truck roll out of the driveway and drive away, and he noticed that the driver was male. He did not see the victim that morning, but testified that it was "absolutely correct" that the victim could have been out there at some point and he just did not see her because he was inside his house in the course of his coming and going. The next-door neighbor also testified that he had helped Defendant with his truck "once or twice" before the victim's death.

¶ 8 Defendant left for work around 6:00 a.m. on August 7. Around 10:30 a.m., his sister arrived at Defendant's home to pick up the victim for an appointment. The front door was locked, and Defendant's son was

---

**3.** When interviewed by police shortly after the murder, the grandmother told an officer that she remembered Defendant telling his girlfriend that she needed to get up early and help him with his truck.

alone in the backyard. Defendant's sister entered the home through the back door and discovered the victim submerged in the guestroom bathtub. The water was running and overflowing the tub. Defendant's sister lifted the victim out of the tub and called 911. Police and paramedics arrived but could not revive the victim. The medical examiner subsequently ruled the death a homicide.

¶ 9 Defendant had just started a new job, and officers were unable to locate him to tell him of his girlfriend's death until he arrived home from work and found his family and ten or twelve police officers gathered there. He arrived home on foot around 3:30 in the afternoon and stated that he had run out of gas and a friend had driven him home.[4] Officers testified that he did not seem to be upset by his girlfriend's death. One officer testified that the first thing he heard Defendant say after learning of his girlfriend's death was, "I need to see if any of my stuff has been stolen."

¶ 10 Defendant voluntarily spoke to the police that afternoon and the following day. He first told a police officer that his girlfriend was asleep when he left for work. He later stated that his girlfriend had helped him start his truck that morning.

¶ 11 At trial, the State's medical examiner testified that the cause of the victim's death was blunt force trauma and asphyxiation. He opined that the victim had been dead before she was placed in the bathtub and that she died prior to 6:00 a.m., but conceded that she could have died as late as 8:00 a.m. He based his calculation of the time of death on four tests involving body temperature, potassium levels, rigor mortis, and lividity,[5] respectively, and he testified that all those tests supported his opinion that the victim died before 6:00 a.m. He acknowledged that the temperature of the bath water, which was unknown, would affect his calculations. The medical examiner also testified that the victim would have had "washer woman hands" if she had been in the water prior to 6:00 a.m., and she did not have washer woman hands.

¶ 12 A subsequent girlfriend of Defendant's testified that Defendant believed the victim's death was the result of a robbery gone awry. The girlfriend also testified that one time when she and Defendant were fighting, she called him a murderer and he knocked her down, breaking one of her ribs. He later apologized, telling his girlfriend that he had hurt her "accidentally." He told her at that time that he had accidentally hurt the victim once when she jumped on his truck and fell off. After his arrest, Defendant told this girlfriend several times that she did not need to talk to the police and alluded to her not being able to see their son if she did talk to the police, implying that Defendant's father would seek custody of their son.

¶ 13 The State's mechanical expert testified that he had tested Defendant's truck in 1996 to see if he could start the truck and make it move forward and backward by himself. His report of that test was lost, so his trial testimony was based on his memory of the tests he performed eleven years earlier. He testified that the gears of Defendant's truck could be shifted from inside the truck or from under the hood without assistance. He acknowledged that he performed these tests on a level surface rather than on a slope such as the slope of Defendant's driveway. The mechanical expert's 1996 affidavit stated that the gears could be shifted from underneath the vehicle or under the hood; however, it does not say that he could shift gears from inside the truck. Although the mechanical expert testified at trial that he was sure that he could shift the gears from inside the truck, he could not remember any other salient details about his investigation of the truck over a decade earlier. Notably, the expert failed to recall that the truck had no steering wheel at the time of his investigation.

¶ 14 The police concluded from their investigation that there was no evidence of a

4. The State's mechanic subsequently examined the truck and testified that it was not out of gas.

5. Lividity refers to the settling of blood via gravity. The medical examiner testified that lividity develops over time and eventually becomes fully fixed, so that when one presses the body, the "color stays, it doesn't blanch away."

robbery, because a purse, cash, and a Rolex watch had not been taken from the home. The police did find, however, that a safe in which Defendant said he stored drugs and money was open and empty.

¶ 15 Finally, an informant and distant relative of Defendant, who was in jail awaiting sentencing, testified that Defendant had talked to him when they were incarcerated at the same time in 2008 and 2009 while Defendant was awaiting trial. The informant stated that Defendant told him (1) his girlfriend did not have any water in her lungs and "[t]hat's what is going to get me," (2) "[i]t wasn't supposed to happen like that," and (3) "[s]he was gone when we put her [in the tub]." To challenge the informant's credibility, Defendant elicited testimony regarding (1) the informant's lengthy criminal history, which included at least seven felonies, several involving deception or dishonesty, and (2) the circumstances surrounding the informant's offer to testify in exchange for help at his sentencing.

¶ 16 According to the prosecution, the informant was offered no favorable treatment in exchange for his testimony and the prosecutor in this case claimed to have been unaware that the informant was an informant on three other homicide cases in addition to Defendant's case. Nevertheless, the informant's sentencing, originally scheduled to occur prior to Defendant's trial, was continued until after he testified against Defendant. The informant's sentencing hearing was ultimately held shortly after Defendant's trial ended and the informant was sentenced to thirty-two days in jail for burglary, even though Adult Probation and Parole recommended that the informant be returned to prison for an indeterminate sentence.

## ISSUES AND STANDARDS OF REVIEW

¶ 17 Defendant argues that his constitutional right to due process was violated by the delay in charging him and the way his girlfriend's murder was investigated. "Constitutional issues, including questions regarding due process, are questions of law that we review for correctness." *Chen v. Stewart*, 2004 UT 82, ¶ 25, 100 P.3d 1177.

¶ 18 Defendant also argues that his trial counsel was ineffective. A claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law that we review for correctness. *See State v. Perry*, 2009 UT App 51, ¶ 9, 204 P.3d 880, *cert. denied*, 215 P.3d 161 (Utah 2009).

¶ 19 Finally, Defendant argues that the trial court erred by failing to provide an adequate jury instruction on jailhouse informant testimony. Whether a court erred by refusing to give a jury instruction presents a question of law that we review for correctness. *See State v. Messer*, 2007 UT App 166, ¶ 9, 164 P.3d 421.

## ANALYSIS

### I. Due Process

¶ 20 Defendant first argues that his constitutional right to due process was violated when (1) the State waited eleven years to charge him, even though the charge was based on evidence known in 1996, and the delay compromised Defendant's ability to defend himself because evidence was lost, a critical witness died, and Defendant's ability to develop leads not followed by police diminished and (2) the State investigated only those leads that implicated Defendant and ignored evidence pointing to anyone other than Defendant.

¶ 21 As an initial matter, the State argues that Defendant did not preserve the issue of preaccusation delay. *See State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346 ("As a general rule, claims not raised before the trial court may not be raised on appeal" unless the party shows plain error or exceptional circumstances.). But even if Defendant adequately preserved this issue, it fails.

¶ 22 The State violates a defendant's federal due process rights[6] when a delay in bringing charges causes prejudice and is motivated by bad faith. *See State v. Hales*, 2007 UT 14, ¶ 45, 152 P.3d 321 (re-

6. Defendant's due process claim refers only to the United States Constitution and cases interpreting federal law, so he has necessarily waived any due process claim under our state constitution. *See, e.g., State v. Hales*, 2007 UT 14, ¶ 38 & n.8, 152 P.3d 321.

quiring a defendant who claims a violation of due process based on preaccusation delay "to show both (1) actual prejudice *and* (2) bad faith") (emphasis in original). "In the context of oppressive preaccusation delay, the Due Process Clause 'has a limited role to play'" because statutes of limitations "'provide the primary guarantee against bringing overly stale criminal charges.'"[7] *Id.* ¶ 43 (quoting *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)). Given this limited role, preaccusation delay violates due process only when it offends "'those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency.'" *Id.* (quoting *Lovasco,* 431 U.S. at 790, 97 S.Ct. 2044). Thus, "due process would not be violated where a prosecutor delays for investigative purposes before bringing charges." *Id.* ¶ 44.

■ ¶ 23 Defendant contends that there can be no good faith explanation for the delay in this case because, shortly after his girlfriend's death, the police were aware of all the evidence that was eventually presented at trial. However, the State could not have known, immediately after the victim died, that the subsequent investigation would be so remarkably unsuccessful. And the State's inability to predict that it would find little else to aid its case does not demonstrate bad faith.

¶ 24 Although Defendant points out that the delay served no investigatory purpose because the State discovered little, if any, new evidence during the years between his girlfriend's murder and the filing of a charge against Defendant, it cannot be disputed that the State did, in fact, continue to investigate. Furthermore, there is no evidence that the State delayed charging Defendant in order to gain a tactical advantage or for other bad faith reasons. *See id.* ¶ 56 ("[N]othing here suggests that the State was attempting to destroy exonerating evidence or increase [its] chance to prosecute the defendant.") (altera-

tion in original) (internal quotation marks omitted). Because Defendant has not established the bad faith element of a due process claim by showing that the State delayed charging Defendant "for the purpose of gaining a tactical advantage or for another bad faith motive," *id.* ¶ 49, we conclude that the delay did not violate Defendant's right to due process.[8]

¶ 25 Defendant also argues that the manner in which the State conducted its investigation before charging Defendant with murder constitutes an independent due process violation. Defendant points specifically to the State's failure (1) to test certain hair samples and fingernail clippings further after DNA testing showed that the samples did not implicate Defendant and (2) to perform DNA testing on the postage stamp from the anonymous confession letter. In support of his argument, Defendant relies on *Wilson v. Lawrence County,* 260 F.3d 946 (8th Cir. 2001), in which the court stated that "reckless or intentional failure to investigate other leads offends a defendant's due process rights." *Id.* at 955. That court distinguished between reckless and intentional conduct in conducting an investigation— which may offend a defendant's due process rights—and negligence or gross negligence in conducting an investigation, which would not give rise to a due process violation. *See id.* As was the situation in *Wilson,* such a claim is not usually raised as a defense in the primary criminal case but rather surfaces in subsequent civil rights litigation where an accused has an opportunity to develop evidence to demonstrate that the investigatory conduct was intentional or reckless. Defendant cites no case other than *Wilson,* which involved a civil rights suit brought pursuant to 42 U.S.C. § 1983, *see id.* at 948. We note that he has not cited a case in which a conviction was set aside on direct appeal on the grounds of improper investigation.

■ ¶ 26 As an initial matter, it appears that defense counsel mentioned investigatory inadequacy only in the context of his argu-

---

7. Thus, contrary to Defendant's statement, the State's statute of limitations argument is not irrelevant. *See id.* ¶ 43. However, we agree that it is not dispositive.

8. Because Defendant has failed to establish the element of bad faith regarding the delay, we need not address the parties' arguments regarding prejudice.

ment that the delay itself violated Defendant's right to due process. Thus, it is doubtful that Defendant preserved for review the claim that the failure to investigate violated his due process rights. *See State v. Van Matre,* 777 P.2d 459, 463 (Utah 1989) (stating that "we do not preclude a due process attack based on investigatory procedures" but declining to consider the issue because the defendant failed to raise the issue below). Nevertheless, even if we were to assume that counsel's references to the purported investigatory inadequacies were sufficient to preserve this issue, Defendant has failed to show that any dereliction in investigating the murder was intentional or reckless.[9] Defendant did not ask the trial court for an opportunity to introduce evidence that would provide such a showing and the record before us does not suggest that the conduct at issue was reckless or intentional. *See, e.g., Sanders v. English,* 950 F.2d 1152, 1162 (5th Cir.1992) (distinguishing between a police officer's *negligent* failure to follow up on exonerative leads and a situation where a police officer "knowingly and willfully ignored substantial exculpatory evidence . . . [and] deliberately looked the other way in the face of exonerative evidence indicating he had arrested the wrong man," which would constitute reckless conduct). Accord-

ingly, Defendant's due process claim based on failure to investigate is also unavailing.[10]

## II. Ineffective Assistance of Counsel

¶ 27 Defendant next argues that his trial counsel[11] was ineffective because (1) he failed to subpoena the victim's cousin to testify to information that implicated a third party in the murder and (2) he failed to present evidence that would have corroborated Defendant's story that his girlfriend was alive when he left for work, including evidence from his next-door neighbor, the victim's grandmother, and an expert witness who was a mechanic. The State responds that this evidence was inconclusive and unlikely to lead to a different result.

¶ 28 In order to demonstrate ineffective assistance of counsel, a defendant must satisfy the two-prong test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), by proving (1) that his counsel rendered deficient performance that fell below an objective standard of reasonable professional judgment and (2) that counsel's deficient performance prejudiced him. *See id.* at 687–92, 104 S.Ct. 2052. To demonstrate deficient performance, a defendant "must identify specific acts or omissions demonstrating that counsel's

9. Civil rights cases alleging due process violations provide guidance on what constitutes intentional or reckless conduct in the context of a claim of constitutionally culpable failure to investigate. *See, e.g., Brockinton v. City of Sherwood,* 503 F.3d 667, 672 (8th Cir.2007) (stating that a plaintiff "must show that [a defendant's] failure to investigate was intentional or reckless, thereby shocking the conscience" because negligently failing to investigate does not violate due process); *Russo v. City of Bridgeport,* 479 F.3d 196, 210 (2d Cir.) (holding that hiding exculpatory evidence, coupled with other evidence, demonstrated an "intentional violation of, or deliberate indifference to, [the plaintiff]'s constitutional rights"), *cert. denied,* 552 U.S. 818, 128 S.Ct. 109, 169 L.Ed.2d 24 (2007); *Sanders v. English,* 950 F.2d 1152, 1162 (5th Cir.1992) (distinguishing between a police officer's negligent failure to follow up on exonerative leads and a situation where a police officer "knowingly and willfully ignored substantial exculpatory evidence . . . [and] deliberately looked the other way in the face of exonerative evidence indicating that he had arrested the wrong man"); *Whitley v. Seibel,* 613 F.2d 682, 686 (7th Cir.1980) (describing intentional acts in an investigation that would

violate due process to include, for example, misleading or misrepresenting "facts and circumstances of the case to the assistant state's attorneys"), *cert. denied,* 459 U.S. 942, 103 S.Ct. 254, 74 L.Ed.2d 198 (1982).

10. This is not to say that the State's decisions to delay and to avoid pursuing certain leads are wholly irrelevant. In fact, they are germane and they can be and indeed were brought to the jury's attention. They go a long way toward establishing a reasonable doubt, as defense counsel pointed out. Nevertheless, the State has broad discretion in choosing the time frame and manner of investigating a crime and courts are unwilling to intrude on this function reserved to the executive branch. *See, e.g., McIntosh v. City & Cnty. of Denver,* No. 95–1346, 1996 WL 108539, at *2 (10th Cir. Feb. 29, 1996) ("The police have discretion in conducting their investigation and pursuing apprehension of the accused. They are left to their professional judgment as to what measures are appropriate.").

11. Defendant is represented by new counsel on appeal.

representation failed to meet an objective standard of reasonableness." *State v. Montoya*, 2004 UT 5, ¶ 24, 84 P.3d 1183 (citation and internal quotation marks omitted). To demonstrate prejudice, a defendant must show that "but for counsel's deficient performance there is a reasonable probability that the outcome of the trial would have been different." *State v. Lee*, 2006 UT 5, ¶ 37, 128 P.3d 1179 (citation and internal quotation marks omitted).

¶ 29 We first consider whether counsel's performance with regard to these claims of error fell below an objective standard of reasonableness. To determine whether a defendant has met this substantial burden, we "must 'eliminate the distorting effects of hindsight ... and ... evaluate the conduct [complained of] from counsel's perspective at the time [it occurred].'" *Menzies v. Galetka*, 2006 UT 81, ¶ 89, 150 P.3d 480 (omissions in original) (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). Thus, so long as "a rational basis for counsel's performance can be articulated, we will assume counsel acted competently." *State v. King*, 2010 UT App 396, ¶ 31, 248 P.3d 984 (citation and internal quotation marks omitted). Before we will reverse a conviction based on ineffective assistance of counsel, we must be persuaded that there was no conceivable tactical basis for counsel's actions. *See id.*

¶ 30 Regarding testimony from the victim's cousin, the record shows that defense counsel wanted the cousin to testify and expected that the State would call him to testify, but defense counsel did not call him as a witness. When the State did not present the cousin as a witness as counsel expected, counsel tried to convince the trial court to allow the cousin to testify for the defense. Thus, it is apparent from his actions that counsel did not, for sound tactical reasons, forego subpoenaing the cousin to testify about the possible culpability of a third party. He wanted the testimony; he just failed to take reasonable steps to secure it. As a result, counsel's failure to present the cousin as a witness was deficient.

¶ 31 We reach the same conclusion as to counsel's failure to identify as a defense witness someone from whom he could elicit testimony regarding the statements of the victim's grandmother, who died in the interim between the murder and the trial. Defense counsel had intended to elicit testimony through the police detective who took the grandmother's statement [12] or another police officer, but the trial court did not allow the testimony because counsel had not given proper notice under rule 807 of the Utah Rules of Evidence, which requires the proponent of certain hearsay evidence to inform the adverse party of the proponent's intention to offer the statement and the particulars of the statement "sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it," Utah R. Evid. 807. The State has suggested no reasonable tactical basis that defense counsel could have had for not ensuring that the grandmother's statement was presented to the jury, and we can think of none. Thus, counsel's conduct in failing to identify, subpoena, and call the necessary witness was deficient.

¶ 32 Defendant also argues that trial counsel was ineffective for failing to present testimony from the mechanic who worked on Defendant's truck after the police released it, even though counsel identified him as a witness before the trial. Defendant states in his brief that this mechanic would have corroborated Defendant's testimony about the truck's problems that necessitated the victim's assistance but has provided no evidence to support this claim. The State responds that mere speculation does not establish deficient performance and, in the absence of evidence regarding the mechanic's proposed testimony, Defendant has failed to satisfy his burden of showing the substance of that testimony, *see State v. Litherland*, 2000 UT 76, ¶¶ 16–17, 12 P.3d 92 (stating that a defendant "bears the burden of assuring [that] the record is adequate," and "an appellate court will presume that any argument of ineffective-

---

**12.** Although the State identified this detective as a possible witness, he also was not called to testify.

ness presented to it is supported by all the relevant evidence of which defendant is aware"). "[A]mbiguities or deficiencies resulting therefrom simply will be construed in favor of a finding that counsel performed effectively." *Id.* ¶ 17. We agree with the State as to the mechanic's testimony.

¶ 33 Regarding his next-door neighbor, Defendant contends that counsel's performance was ineffective because he failed to follow up on certain testimony that would have corroborated Defendant's testimony regarding the truck's mechanical problems. During a preliminary hearing, the neighbor had testified about his experiences helping Defendant with his truck in the weeks before the murder, but counsel did not develop that testimony during the trial. As with the grandmother's statement, the State has suggested no strategic reason for counsel's failure to have this evidence introduced, and, again, we can think of none. Thus, counsel's failure to develop this testimony was deficient.

¶ 34 In the absence of a "rational basis for counsel's performance," *State v. King*, 2010 UT App 396, ¶ 31, 248 P.3d 984, we conclude that counsel's performance in failing to secure helpful testimony about the grandmother's statement, from the neighbor, and from the victim's cousin fell below an objective standard of reasonableness. *See, e.g., State v. Templin*, 805 P.2d 182, 188 (Utah 1990) ("If counsel does not adequately investigate the underlying facts of a case, *including the availability of prospective defense witnesses,* counsel's performance cannot fall within the wide range of reasonable professional assistance.") (emphasis added) (citation and internal quotation marks omitted). Accordingly, we now consider the prejudice prong of the ineffective assistance analysis.

¶ 35 Defendant's claims of ineffective assistance focus on defense counsel's failure to present evidence that would have (1) corroborated Defendant's story that his girlfriend

was alive when he left his home at 6:00 a.m. because he could not have driven his truck without her assistance and (2) informed the jury that someone was at Defendant's home on August 7 after Defendant left home. Regarding the first point, the grandmother's statements and the neighbor's testimony would have supported Defendant's testimony that he needed his girlfriend's help to get his truck going in the morning. First, the grandmother had told a detective that she remembered Defendant telling his girlfriend that she needed to get up early (on August 7) to help him with his truck. Second, although Defendant's next-door neighbor testified at trial, "I do believe I had helped him once or twice with his truck," his testimony at the preliminary hearing provided additional information about his experiences helping Defendant with his truck in the past. This additional evidence from the victim's grandmother and the neighbor, who testified that Defendant's girlfriend might well have been outside with Defendant early on the morning of August 7 and he simply did not see her, would have corroborated Defendant's story about his truck and his need for his girlfriend's help in the morning.

¶ 36 Regarding the second point, the victim's cousin could have told the jury that (1) the victim had called him between 1:00 and 3:00 a.m. on August 7, (2) he saw a brown car parked in Defendant's driveway on the morning of August 7, and (3) on the day of the victim's funeral, he received an anonymous threatening phone call telling him that he "did not see a brown car." Defendant contends that this testimony from the cousin places a third party at the crime scene on the morning of the murder and shows that the cousin was threatened because of that knowledge. This is particularly significant when considered in conjunction with testimony from other neighbors about unusual activity in the neighborhood the day of, and in the weeks before, the victim's death.[13]

¶ 37 Although each piece of evidence described above is not, by itself, overwhelming-

---

**13.** Several neighbors testified at trial that they had observed unusual activity in the neighborhood the day of the murder and during the weeks preceding the murder. Two neighbors saw suspicious men walking toward Defendant's home in the early morning hours on the day of the murder, and a third neighbor saw a stranger wearing a disguise looking in the windows of Defendant's home a few weeks prior to the murder. These neighbors reported that activity to the police after the murder.

ly suggestive of Defendant's innocence, taken together this evidence undermines our confidence in the jury's verdict. Looking at the big picture, the eleven-year delay in bringing charges against Defendant indicates that the State was trying to find more evidence against him which, in turn, indicates that it believed the case was not particularly strong. Defendant's appellate counsel has persuasively argued that this is such a thin case that almost any error has the potential to be prejudicial.[14] Furthermore, we note that the trial court carefully considered Defendant's motion for a directed verdict, requesting briefing and hearing argument on that motion. Although the court ultimately denied the motion, it stated that it had misgivings about the verdict and that it was "troubled" by some of the evidence.

¶ 38 Under *Strickland*, even when counsel's performance is inadequate, a defendant who has been convicted of a crime is not entitled to a new trial unless the defendant establishes that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt" about his guilt. *Strickland v. Washington*, 466 U.S. 668, 691, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A reasonable probability is one "sufficient to undermine confidence in the [jury verdict]." *Id.* at 694, 104 S.Ct. 2052. Because "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect," when determining the impact of an error, we "consider the totality of the evidence before the . . . jury." *Id.* at 695–96, 104 S.Ct. 2052.

¶ 39 Here, the case comes down to whether there is a reasonable doubt that the victim died before 6:00 a.m. If she died after 6:00 a.m., then no reasonable jury could convict Defendant. Considering the circumstantial nature of the evidence upon which Defendant was convicted and the cumulative effect of the evidence that was *not* presented due to defense counsel's deficient performance, we are not confident that the result would have been the same had counsel presented the evidence at issue to the jury. Therefore, we reverse Defendant's conviction and remand for a new trial.

### III. Jury Instruction

¶ 40 Defendant also argues that the trial court erred by failing to provide a jury instruction regarding how to weigh jailhouse informant testimony.[15] Defendant requested a lengthy instruction modeled after an instruction required in Oklahoma whenever a jailhouse informant testifies.[16] *See Dodd v. State*, 2000 OK CR 2, ¶ 26, 993 P.2d 778, 784. Over defense counsel's objection, the court instead instructed the jury as follows:

The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating this testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness. This does not mean that you may arbitrarily disregard this testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in this case.

¶ 41 We are not necessarily persuaded at this point that the trial court erred by giving the jury this instruction, particularly in the

---

**14.** Just as we are more ready to view errors as harmless when confronted with overwhelming evidence of a defendant's guilt, *see, e.g., State v. Bishop*, 753 P.2d 439, 499–500 (Utah 1988) (Zimmerman, J., concurring in the result), *overruled on other grounds by State v. Menzies*, 889 P.2d 393 (Utah 1994), *cert. denied*, 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995), we are more willing to reverse when a conviction is based on comparatively thin evidence, *see, e.g., State v. Havatone*, 2008 UT App 133, ¶ 17, 183 P.3d 257.

**15.** Although not necessary to our decision in view of our reversal on other grounds, it is appropriate that we comment on this issue. *See* Utah R.App. P. 30(a) ("If a new trial is granted,

the court may pass upon and determine all questions of law involved in the case presented upon the appeal and necessary to the final determination of the case."); *State v. Cloud*, 722 P.2d 750, 755 (Utah 1986) ("When a new trial or further proceeding is ordered, it is our duty to pass upon questions of law which may be pertinent and helpful in arriving at a final determination of the case.") (citation and internal quotation marks omitted).

**16.** Utah's model jury instructions do not include a pattern instruction addressing testimony by a jailhouse informant. *See* Model Utah Jury Instructions (2d ed.).

context of the unusually broad latitude the court gave Defendant to present testimony regarding every detail that might be relevant to the jury's consideration of the informant's credibility, including allowing testimony regarding the informant's crimes that were older than ten years and testimony regarding crimes that were not related to honesty. *See generally* Utah R. Evid. 609.[17] Nevertheless, on balance, it does seem to us that the better instruction is the one Defendant proposed.[18] It is more specific to the issues that may arise when a jailhouse informant testifies, and we think it would be helpful to the jury based on the particular factual circumstances of the informant's testimony in this case.

## CONCLUSION

¶ 42 We see no due process violation here based on either the State's delay in charging Defendant or its methods of investigation. However, considering the circumstantial nature of the evidence upon which Defendant was convicted and the cumulative effect of defense counsel's errors, we think there is a reasonable probability that, absent the errors, the jury would have had a reasonable doubt about his guilt. *See Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. Accordingly, we reverse Defendant's conviction and remand for a new trial.

¶ 43 WE CONCUR: JAMES Z. DAVIS, Presiding Judge, and STEPHEN L. ROTH, Judge.

**17.** Rule 609 provides some limits on the admissibility of evidence for purposes of attacking the credibility of a witness other than the accused depending on the nature of the evidence. For example, "evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment." Utah R. Evid. 609(a)(2). However, "evidence that a witness ... has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year," if the court "determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused." *Id.* 609(a)(1). In addition,

> [e]vidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

*Id.* 609(b).

**18.** Defense counsel requested the following instruction:

> You have heard from a witness who may be classified as a "jailhouse informer." The law allows the use of such testimony. However[,] the testimony of an informer who provides evidence against a defendant must be examined and weighed by you with greater care than the testimony of an ordinary witness. Whether the informer's testimony has been affected by interest or prejudice against the defendant is for you to determine. In making that determination, you should consider:

> (1) whether the informer has received anything (including leniency in prosecution, personal advantage, or vindication) in exchange for testimony;

> (2) other cases, and the number of other cases, in which the informer testified or offered statements against another, whether those statements are being used, and whether the informer received any deal, promise, inducement, or benefit in exchange for that testimony or statement[,] or believed he was likely to receive some benefit from his cooperation;

> (3) whether the informer has ever changed his or her testimony;

> (4) the criminal history of the informant, not just limited to number of convictions, but also the level of sophistication gained through the informer's experience in the criminal justice system; and

> (5) any other evidence related to the informer's credibility.

> In sum, you should look at all of the evidence in deciding what credence and what weight, if any, you would want to give to the jailhouse informer.

> You should bear in mind that a witness who has entered into such an agreement with the government may have an interest in the case different than any ordinary witness. A witness who believes that he may be able to obtain his own freedom, or receive a lighter sentence by giving testimony favorable to the prosecution, has motive to testify falsely. Therefore, you must examine his testimony with caution and weigh it with great care. If, after scrutinizing his testimony, you decide to accept it, you may give it whatever weight, if any, you find it deserves.