**2017 UT App 172**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CARL MACK COURTNEY,
Appellant.

Opinion
No. 20141171-CA
Filed September 8, 2017

Second District Court, Ogden Department
The Honorable Michael D. DiReda
No. 131900508

Emily Adams, Attorney for Appellant

Sean D. Reyes and Tera J. Peterson, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and MICHELE M. CHRISTIANSEN concurred.[1]

ORME, Judge:

¶1      Defendant Carl Mack Courtney was convicted of drug possession with intent to distribute and possession of drug paraphernalia. He appeals both convictions, arguing that the trial court abused its discretion by admitting impermissible character evidence and that he was denied his right to the effective assistance of counsel. We conclude that, even in the absence of the errors Defendant ascribes to the trial court and his

---

1. Judge J. Frederic Voros Jr. participated in this case as a member of the Utah Court of Appeals. He retired from the court before this decision issued.

trial attorney, the jury would not have returned a different verdict. Accordingly, we affirm.


BACKGROUND

¶2      On the morning of August 26, 2010, a police officer was patrolling the parking lot of an Ogden apartment complex when he noticed a man wandering the lot, "looking in and around vehicles." The officer decided to investigate, as several vehicle burglaries had recently been reported in the area. The officer asked the man "what was going on." Defendant responded that he was looking for a lost child, but—oddly—he declined the officer's offer to assist in the search. Defendant's pupils were dilated, and he appeared "nervous" and "very fidgety." At the officer's request, Defendant provided identification and permitted the officer to search his person.

¶3      During the search, the officer found several items that convinced him he had probable cause to arrest Defendant. The officer found approximately "60 small Ziploc plastic baggies" and a four- to five-inch pocket knife in Defendant's left-front pants pocket. He also found a sheet of paper containing a list of names and dollar amounts, which ranged between $40 and $300. The officer recognized some of the names on the sheet—among them, "Half Pint," "Truck," and "Pops"—as belonging to individuals he had dealt with during previous narcotics investigations. He would later testify that the paper appeared to be an "owe sheet" and that he knew from his training and experience that distributors of narcotics often used such lists to keep track of "who owes you what."

¶4      After he was taken into custody, Defendant requested that his then-girlfriend be informed of his arrest. The girlfriend, who resided at the apartment complex where the arrest took place, was watching Defendant's daughter at the time. She would need to be informed that Defendant would not be driving his daughter to her first day of kindergarten that morning.

¶5 The officer agreed to inform the girlfriend of the situation and called for backup to assist him. When backup arrived, the officer left Defendant in the custody of another police officer while he and a third officer proceeded to meet with the girlfriend. After assuring the officers that she would get Defendant's daughter to school on time, the girlfriend agreed to answer their questions about Defendant. She told them that Defendant had borrowed her car the day before and that he had driven it back to her apartment earlier that morning. She then agreed to allow the officers to search the car.

¶6 Inside the car the officers found a "black zip-up pouch" resting on top of a "blue and black zip-up sweatshirt." Inside the pouch they found a "hypodermic needle" and a "plastic baggy containing a white crystal substance," which the Utah State Crime Lab later confirmed to be methamphetamine. The officer later testified that the girlfriend, without being told of the contents of the pouch, informed him that the pouch belonged to Defendant and that she had seen him carrying his identification in it a few days earlier. Both the officer and the girlfriend testified that the car doors were locked and the windows were rolled up just before the search.

¶7 The officers questioned Defendant regarding what they had discovered in the vehicle. Defendant confirmed that he had driven the girlfriend's car to her apartment that morning, that he had been the only one inside the car, and that he kept a sweatshirt in the car like the one on which the pouch had been found. He denied, however, that the pouch and its contents were his. He also told them that he used the Ziploc baggies to store coins from his coin collection, but the officers were unable to find any coins on Defendant's person or in the car.[2]

---

2. At oral argument, Defendant's appellate counsel acknowledged that trial counsel introduced neither Defendant's

(continued…)

¶8     At the jail, the booking officer conducted an inventory search of Defendant's personal belongings. As was his routine, the officer confiscated Defendant's cell phone, intending to shut it off for storage. But before he could, a text message "popped through." It read, "Are you willing to trade glass for a computer that hasn't been tweaked off of[?]"

¶9     The State charged Defendant with possession of a controlled substance with intent to distribute and possession of drug paraphernalia. The former is a second degree felony; the latter is a class B misdemeanor. *See* Utah Code Ann. §§ 58-37-8(1)(a)–(b), 58-37a-5(1) (LexisNexis 2016).

¶10     Prior to trial, the State filed notice of its intent to introduce evidence that Defendant had been convicted of distributing methamphetamine in 2012. That conviction, which resulted from events that occurred after the events giving rise to the convictions at issue in this case,[3] involved a recorded sale of methamphetamine to a confidential informant in the presence of

---

(…continued)
baggie-encased coin collection nor any testimony concerning his numismatic interest, aside from Defendant's own testimony.

3. The trial court took note of the fact that, ordinarily, introducing evidence of prior bad acts involves putting on evidence of acts committed *before* the events that gave rise to the trial in which the evidence is introduced. However, the court did not suggest that the State's attempt to introduce evidence relating to Defendant's 2012 conviction was for that reason improper, and Defendant has not argued that the court's failure to exclude the evidence on those grounds was error. Nor would such an argument be availing. *See, e.g., State v. Lomu*, 2014 UT App 41, ¶¶ 23–25, 321 P.3d 243.

an undercover officer.[4] The State sought to introduce evidence of the events underlying that conviction, arguing that the evidence would show Defendant's "intent," "any absence of mistake or lack of accident," and "any motive that he would have for" possessing the methamphetamine. Although the trial court stated that it did not want to "spend an inordinate amount of time re-trying that other case," it said it would allow the State to introduce "basic facts" relating to Defendant's distribution conviction because it found the evidence "extremely probative" and not overly prejudicial.

¶11   At trial, the officer explained to the jury that based on his experience investigating narcotics crimes, the methamphetamine he seized from the car amounted to a "distribution quantity." The officer also testified that narcotics dealers typically carry a weapon, such as the knife Defendant had been carrying on the morning of his arrest, to protect themselves against robbery. The officer answered questions regarding the text message the booking officer had discovered, explaining that "[g]lass is a common reference to methamphetamine" and that "tweaking" means "using meth." Finally, he testified that baggies such as the ones Defendant had been carrying are commonly used to package and distribute narcotics.

¶12   The State also called the girlfriend to testify. She stated that the methamphetamine the officer had found in her car did not belong to her and that the sweatshirt and black pouch both belonged to Defendant. Further, she stated that at various times in the past she had seen Defendant store his identification and Social Security card in the pouch, as well as methamphetamine. She also testified that she had used methamphetamine with Defendant, that Defendant had provided the drug to her, and that she had seen Defendant sell the drug to others. When asked

---

4. We recently vacated Defendant's 2012 conviction and remanded for a new trial due to ineffective assistance by his trial counsel. *See State v. Courtney*, 2017 UT App 62, ¶ 24.

what Defendant used to store and distribute the drug, she responded that she had seen him use "little plastic baggies."

¶13    The girlfriend then testified that while Defendant was in jail awaiting trial, he called to speak with her about the testimony she would be giving and about the black pouch the officer had found in her car. The call was recorded, and the State played it for the jury. During the recorded conversation, Defendant asked the girlfriend whether her windows were "down or up" when the officers searched her car. She responded, "Pretty sure my car windows were up." "That's the wrong answer," he replied. The girlfriend continued to insist she was right, but he interjected, "You're not fucking hearing what I'm saying. I know what they were and what they weren't. . . . If they were down, anybody could have fucking threw that thing . . . in there. . . . [T]he Mexican people that we had no fucking clue who they are could have easily fucking done that[.]"

¶14    The girlfriend testified that, in fact, the windows of her car had been rolled up on the morning Defendant was arrested. She further testified that she had seen no one other than the officers standing near the car.

¶15    Finally, the State called the undercover officer who took part in the controlled buy that led to Defendant's 2012 distribution conviction. As the trial court had limited the scope of what it would allow with respect to that conviction, the undercover officer's testimony was brief. He told the jury that four individuals were in the room where the controlled buy took place, that the purchase went forward, and that Defendant was later tried and found guilty of distributing methamphetamine.

¶16    After the State rested, Defendant took the stand in his own defense. He testified that the methamphetamine the officer found in the black pouch did not belong to him. He did admit, however, that he had struggled with drug addiction throughout his life and that he had "relapsed" just two weeks before he was arrested. He also admitted that, before trial, he had contacted the girlfriend to tell her to "get lost" so that she could not be

subpoenaed to testify. Finally, he admitted that, a "long, long, long time ago in '98," he had gotten "in trouble" for distributing narcotics.

¶17 Defendant also offered several explanations to rebut the State's evidence against him. First, he testified that the baggies the officer found were for storing coins, not narcotics. Second, he testified that the text message the booking officer found on his cell phone referred literally to glass and not to methamphetamine, as he had been asking around for help with fixing a broken window. Finally, he claimed that the "owe sheet" the officer found in his pocket did not belong to him. Rather, he said it belonged to his friend, "Missy," and that he had been collecting on some loans for her when he was arrested. Acknowledging that Missy was not in the courtroom and would not be testifying on his behalf, Defendant stated that he had not seen her in three years and that his attorney "had trouble locating her."

¶18 Apparently unmoved by Defendant's testimony,[5] the jury returned a guilty verdict on both counts. Defendant appeals.

ISSUES AND STANDARDS OF REVIEW

¶19 Defendant raises two arguments on appeal. First, he argues that it was error for the trial court to admit evidence of his 2012 distribution conviction under Utah Rule of Evidence 404(b) for the purpose of proving that Defendant intended to

---

5. Defendant's wife, whom he married just prior to trial, also testified on his behalf. She testified that Defendant had been trying to "trade somebody a computer for a sheet of glass," that she had never seen him carry a black pouch, that she had never seen him sell drugs, and that before his arrest he had indeed been collecting money on Missy's behalf. The jury apparently did not credit these statements.

distribute narcotics in the instant case.[6] Generally, we review a trial court's decision to admit evidence under rule 404(b) for an abuse of discretion. *See State v. Burke*, 2011 UT App 168, ¶ 17, 256 P.3d 1102. Even if we see error, "we will not overturn the defendant's conviction unless the error was harmful." *State v. High*, 2012 UT App 180, ¶ 28, 282 P.3d 1046.

¶20　Second, Defendant maintains that his trial counsel's performance was so deficient that he was denied his right to the effective assistance of counsel under the Sixth Amendment to the United States Constitution. "A claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law," which we consider de novo. *State v. Charles*, 2011 UT App 291, ¶ 18, 263 P.3d 469. But even if we conclude that trial counsel's performance was deficient, the claim must fail absent a reasonable probability that Defendant would have obtained a more favorable outcome but for trial counsel's blunders. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.

## ANALYSIS

### I. Evidence of Prior Conviction

¶21　Defendant maintains that "the lack of similarity" between the facts underlying the 2012 conviction and the instant circumstances, as well as the "lengthy interval of time between the crimes," are "pivotal factors that weigh against admission"

---

6. Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). But the rule further provides that such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, . . . or lack of accident." *Id.* R. 404(b)(2).

and that the trial court erred in permitting the jury to learn of that conviction. Upon reviewing the other evidence adduced at trial, however, we think it unnecessary to further consider Defendant's argument, given the harmless error doctrine.

¶22 "'Harmless errors are those that are sufficiently inconsequential so no reasonable likelihood exists that the error affected the outcome of the proceedings.'" *State v. Ferguson*, 2011 UT App 77, ¶ 19, 250 P.3d 89 (quoting *Taylor ex rel. C.T. v. Johnson*, 1999 UT 35, ¶ 18, 977 P.2d 479). Even where "the trial court erred in failing to conduct a thorough analysis under rule 404(b), [we] will not overturn a jury verdict . . . if the admission of the evidence did not reasonably affect the likelihood of a different verdict." *Id.* (alteration in original) (citations and internal quotation marks omitted). Such is the case where, as here, the other evidence of guilt is "overwhelming." *See id.*

¶23 Even after disregarding all evidence admitted as a result of the errors Defendant ascribes to his trial attorney on his claim of ineffective assistance of counsel,[7] more fully considered hereafter, we conclude that the case against Defendant was all but insurmountable, in view of the admissions he made on the stand, the implausibility of the explanations he offered to rebut the State's evidence, and his damning pre-trial phone call with the girlfriend. And the other evidence against Defendant was so overwhelmingly strong that it only bolsters our conclusion that any error in admitting evidence of the 2012 conviction was harmless.

¶24 As to Defendant's admissions, the jury did not need to hear evidence of the 2012 conviction to learn that Defendant had

---

7. Defendant attributes to his trial counsel Missy's failure to testify. Even if Missy had testified, and did so in the favorable way Defendant anticipates, the jury would not have been shielded from the officer's testimony regarding the incriminating "owe sheet" he found on Defendant's person.

used and distributed drugs in the past; Defendant told them as much himself. When asked whether he had a history of distributing narcotics, Defendant responded that he had indeed gotten "in trouble" for it, albeit "[a] long, long, long time ago." And while he did not confess to selling drugs recently, he did confess that getting "in trouble" did not put a stop to his own drug abuse. In fact, he admitted that his last "relapse" occurred only two weeks prior to his arrest.

¶25    The explanations Defendant offered to rebut the State's evidence against him did little to help Defendant's case because they were altogether implausible. Defendant's attempt to explain away the text message that the booking officer found on his phone was entirely incredible. Even if it were true that Defendant had been in the market for some "glass" in the literal sense of the word, this would not explain why the text message's author felt compelled to add the caveat that the offer to trade glass for a computer was contingent on the computer's not having been "tweaked off of." Likewise, Defendant's claim that he carried around plastic baggies for the purpose of storing coins from his coin collection is dubious at best, as the officer was unable to find any coins in the baggies, in Defendant's pocket, or in the girlfriend's car. And while Defendant did testify on his own behalf at trial, he did not introduce his coin collection into evidence or otherwise substantiate his claimed numismatic interest.

¶26 What is perhaps most damaging to Defendant's credibility, and what best underscores the harmlessness of any rule 404(b) error made by the trial court, is the call he made to the girlfriend while he was in jail awaiting trial. The jury was given the opportunity to listen to Defendant berate the girlfriend for hesitating to accept his instructions about her trial testimony. In response to the girlfriend's insistence that her windows had been rolled up on the morning of Defendant's arrest, he roared back, "You're not fucking hearing what I'm saying. I know what they were and what they weren't. . . . If they were down, anybody could have fucking threw that thing . . . in there."

Moreover, while on the stand Defendant admitted that he had called the girlfriend to tell her to "get lost" so that the prosecution could not subpoena her testimony.

¶27   In sum, evidence of Defendant's 2012 conviction was inconsequential in the context of his own testimony and the other evidence against him. Any error regarding the admission of that conviction into evidence was therefore harmless.

## II. Ineffective Assistance of Counsel

¶28   Defendant argues that his trial attorney performed so poorly that he was denied his right to the effective assistance of counsel. In Defendant's view, more competent counsel would have (1) objected when the State introduced evidence under Utah Rule of Evidence 404(b) detailing the underlying facts of the 2012 conviction; (2) requested that the State give notice of its intent to introduce rule 404(b) evidence[8] and objected when such evidence was elicited from the girlfriend; and (3) subpoenaed Missy to appear as a witness on Defendant's behalf.[9]

---

8. Utah Rule of Evidence 404(b) provides that a "prosecutor must . . . provide reasonable notice of the general nature" of any evidence it intends to introduce of a defendant's prior "crime, wrong, or other act." Utah R. Evid. 404(b)(1), (b)(2)(A).

9. Defendant does not contend that his trial counsel was ineffective for permitting him to take the stand and undercut his own case. This is well-advised. Our Supreme Court has previously held that a defendant's decision to take the stand rather than rely on his privilege against self-incrimination is a decision that is personal to the defendant. *State v. Anderson*, 495 P.2d 804, 806 (Utah 1972) ("An attorney for a [defendant] cannot claim a privilege against self-incrimination; he can only advise the [defendant].").

¶29    In proving that counsel performed ineffectively, a defendant must show "(1) that counsel's performance was objectively deficient, and (2) a reasonable probability exists that but for the deficient conduct the defendant would have obtained a more favorable outcome at trial." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶30    Under the "prejudice" prong of the ineffective assistance of counsel test, the defendant has the burden of "show[ing] that the error was harmful." *State v. Jimenez*, 2012 UT 41, ¶ 15, 284 P.3d 640. *See also Menzies v. State*, 2014 UT 40, ¶ 77, 344 P.3d 581 ("The defendant . . . has the obligation to affirmatively prove prejudice[.]"). In other words, the defendant must convince us that the error was so prejudicial to the defendant's case that "'our confidence in the verdict is undermined.'" *State v. Munguia*, 2011 UT 5, ¶ 12, 253 P.3d 1082 (quoting *State v. Holgate*, 2000 UT 74, ¶ 13, 10 P.3d 346).

¶31    We conclude that Defendant's ineffective assistance of counsel claim fails under the prejudice prong for the same reason that any error the trial court may have committed in allowing evidence of his 2012 distribution conviction was harmless: the evidence against Defendant was overwhelming. The damaging admissions Defendant made on the stand, the implausible explanations he put forward to rebut the State's evidence, and the incriminating statements Defendant made to the girlfriend over the phone collectively establish that the jury would have returned the same verdict regardless of any deficiencies in the performance of Defendant's trial attorney.

¶32    Defendant's contention that his trial counsel should have objected to the State's introduction of his 2012 conviction is, in essence, a restatement of the rule 404(b) error he attributes to the trial court in his first argument. We concluded above that the jury would not have returned a different verdict even if evidence of Defendant's 2012 conviction had been excluded. Accordingly, it would have made no difference if Defendant's counsel had successfully objected to that evidence. Likewise, Defendant's second ineffective assistance argument fails because any

evidence admitted as a result of his trial counsel's failure to request notice of rule 404(b) evidence would have done nothing to mitigate the prejudicial effect of the other evidence against him, as outlined in the preceding section.[10]

¶33 Finally, we conclude that the failure of Defendant's trial counsel to subpoena Missy cannot support an ineffective assistance of counsel claim. We reach this conclusion for two independent reasons.

¶34 First, as with the girlfriend's testimony regarding Defendant's past wrongful acts, the testimony Defendant claims Missy would have provided would not have mitigated the overwhelming persuasive power of the State's other evidence. Even if Missy had been located, appeared in court to testify, and acknowledged that the owe sheet belonged to her, such testimony would not have counteracted the damage that was done as a result of Defendant's own admissions, his implausible explanations, and his pre-trial communications with the girlfriend.

¶35 Second, the testimony Defendant claims he could have elicited from Missy would have been cumulative. Defendant insists that "[Missy's] testimony would have clearly supported [his] story that the owe sheet was not his." He also maintains that since "the owe sheet was key to the State's argument that [Defendant] intended to distribute drugs, it is likely that the outcome of the trial would have been different" had Missy taken the stand. Yet Defendant's arguments ignore the fact that the jury learned this information during the testimony of other witnesses. Defendant, of course, testified that the owe sheet

---

10. Because we conclude that Defendant was not prejudiced by the girlfriend's testimony regarding his past wrongful acts, we have no need to address the State's argument that her testimony provided evidence "intrinsic" to the charged offenses and therefore fell outside the scope of Utah Rule of Evidence 404(b).

belonged to Missy and not to him. But the jury did not even need to take his word for it. The girlfriend, whose testimony Defendant otherwise seeks to bar, offered the same testimony. In fact, she went so far as to testify that she did not recognize the handwriting on the owe sheet as being Defendant's. Thus, even assuming that Missy's testimony would have been as favorable to Defendant as he contends, our confidence in the jury's verdict is unshaken by her absence.

## CONCLUSION

¶36   We conclude that any errors committed by the trial court and any missteps by Defendant's counsel had no prejudicial impact upon the result of Defendant's trial. Accordingly, we do not disturb the verdict and resulting convictions.

¶37   Affirmed.

————————